**Joelle FISHMAN et al.**

v.

**Gloria SCHAFFER, in her Official Capacity as Secretary of State of the State of Connecticut, et al.**

**Civ. No. H–76–263.**

United States District Court,
D. Connecticut.

Aug. 19, 1976.

See, also, —— U.S. ——, 97 S.Ct. 14, 50 L.Ed.2d 56.

Frank Cochran, Conn. Civil Liberties Union Foundation, Hartford, Conn., Howard I. Gemeiner, New Haven, Conn., for plaintiffs.

Daniel Schaefer, Asst. Atty. Gen., Hartford, Conn., David B. Losee, Connolly, Holtman & Losee, West Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

Before MESKILL, Circuit Judge, and BLUMENFELD and NEWMAN, District Judges.

BLUMENFELD, District Judge.

### I.  *The Plaintiffs' Challenge*

■ The case before us was filed in the District Court of Connecticut at Hartford on July 2, 1976. Since it seeks a declaratory judgment and an injunction against the enforcement of certain provisions of Connecticut's election laws on the ground that they are unconstitutional, the provisions of 28 U.S.C. § 2281 required that the matter be heard and determined by a three-judge court. Because of the time pressures involved in this matter, as will later more fully appear, the case was advanced on the docket for hearing on August 4, 1976.[1]

The cause of action and the court's jurisdiction are properly asserted under Title 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

---

1.  The case has been submitted to the court on the complaint, answer, and cross-motions for summary judgment, each of which are supported by affidavits, and both parties have

It is the contention of the plaintiffs that a specific portion of Connecticut's election laws relating to the right of an individual to stand for election to public office and have his name listed on the ballot is so unreasonably burdensome as to be constitutionally invalid.[2] The plaintiffs challenge only one element of Connecticut's system of qualifying potential candidates for public office for a place on the ballot by use of a nominating petition signed by electors; they do not, and could not, challenge the limitation of candidates in and of itself, for as the Supreme Court has noted:

> "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."

*Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

A brief description of what Connecticut requires in order to demonstrate that "significant modicum of support" will serve to place the plaintiffs' claim into sharper focus. Connecticut has one of the least demanding schemes for enabling potential candidates to gain a place on the ballot.[3] Potential candidates need to submit petitions signed by electors equal to only one percent of the number who voted for the same office in the previous election. Immediately after the previous state-wide elections, the forms on which to have these signatures made may be obtained from the Secretary of the State. Thereafter the signed petitions may be submitted by the circulator who obtained them to the town clerks where the signers reside until nine weeks before the next election. At the time that person submits them he or she must sign a statement certifying the authenticity of the signatures in the presence of the town clerk. This gives a potential candidate a maximum of more than 21 months to obtain and file the necessary petition signatures. Incidentally, it may also give him or her a substantial headstart in campaigning since party candidates are not nominated until more than a year later.

■ That both the numerosity requirements and the time in which to satisfy them are markedly more favorable to the potential candidate in Connecticut than are constitutionally required, readily appears in light of recent Supreme Court decisions.[4] Measured against the pattern of the foregoing decisions, we do not hesitate to say that for the purpose of demonstrating that a

---

agreed that the hearing shall be treated as one on the merits under Rule 65(a)(2), Fed.R.Civ.P.

2. The requirements of the several states are concisely listed in *Developments in the Law of Elections*, 88 Harv.L.Rev. 1111, at 1124–25 n. 11 (1975).

3. Conn.Gen.Stat.Ann. §§ 9–453a to 9–453s (1976 Supp.).

4. In *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), a challenge to the constitutionality of California's statute regulating qualification of independent candidates was considered. In California, petition signatures must equal five per cent of the total vote cast in the previous election, but the pool from which signers may be obtained excludes those who voted in the primary, and petitions may not be circulated until approximately two months after the primary. Instead of sustaining or striking down California's scheme, the Court directed the district court to find out

what percentage the required 325,000 would be when measured against the available pool (total votes cast in 1972 less those who voted in the preceding primary) and then to decide whether a "reasonably diligent" candidate could be expected to meet the requirements. 415 U.S. at 738–40, 94 S.Ct. 1274.

And in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), Georgia's requirement that independent candidates obtain signatures from five per cent of the voters in 180 days, and pay a filing fee equal to three per cent of the annual salary of the office sought, were held not to place a burden on first amendment rights and therefore did not require special justification. 403 U.S. at 440.

Finally, in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), where the Court realistically balanced the burden imposed by a time limitation for obtaining a specific number of signatures against the state's interest in a demonstration of a fair measure of voting support, the Court stated:

would-be candidate has "a significant measurable quantum of community support," *American Party of Texas v. White*, 415 U.S. 767, 782 & n. 14, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744, Connecticut's election laws impose no constitutionally impermissible burden on the plaintiffs in those respects.

■ Having matched those two substantive elements in Connecticut's access-to-the-ballot scheme against similar ones in Georgia, Texas and California which the Supreme Court has upheld as constitutionally permissible,[5] we find Connecticut's to be substantially less restrictive. However, our inquiry does not end because of our determination that the overall effect of Connecticut's scheme is not violative of the Constitution, for as the Court demonstrated in *American Party of Texas* it is necessary to analyze each of the restrictions separately to determine whether they make qualification impermissibly burdensome.[6]

We turn therefore to the requirement that the signatures on the petition must be authentic.

■ There is no doubt that qualifications may be imposed upon those who sign a petition to ensure that only eligible persons may sign, and that they sign only once. The plaintiffs do not dispute that provisions to effect such qualification are justifiable because of the State's compelling interest in "preservation of the integrity of the electoral process." *American Party of Texas v. White*, 415 U.S. at 782 & n. 14, 94 S.Ct. at 1307. To safeguard that interest a requirement that "all signatures evidencing support for the party, whether originating at the precinct conventions or with supplemental petitions circulated after primary day must be notarized" was held valid in *American Party of Texas*, 415 U.S. at 787, 94 S.Ct. at 1309. Indeed, the plaintiffs do not question the State's right to require proof of the

"Neither do we consider that the 55 days is an unduly short time for circulating supplemental petitions. Given that time span, signatures would have to be obtained only at the rate of 400 per day to secure the entire 22,000, or four signatures per day for each 100 canvassers—only two each per day if half the 22,000 were obtained at the precinct conventions on primary day. A petition procedure may not always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required the States to do the impossible. *Dunn v. Blumstein*, 405 U.S. 330, 360 [92 S.Ct. 995, 1012, 31 L.Ed.2d 274] (1972). Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by Texas are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements." 415 U.S. at 786–87, 94 S.Ct. at 1308 (footnote omitted).
A similar assessment was made by the Court in *Storer v. Brown,* 415 U.S. 724, 740, 94 S.Ct. 1274, 1284, 39 L.Ed.2d 714:
"Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each

gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President. But it is a substantial requirement; and if the additional likelihood is, as it seems to us to be, that the total signatures required will amount to a substantially higher percentage of the available pool than the 5% stipulated in the statute, the constitutional claim asserted by Hall is not frivolous. Before the claim is finally dismissed, it should be determined whether the available pool is so diminished in size by the disqualification of those who voted in the primary that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden on the independent candidates for the offices of President and Vice President."

**5.** *See* note 4 *supra.*

**6.** While "[a]ll procedures used by a State as an integral part of the election process must pass muster against charges of discrimination or abridgement of the right to vote," *Moore v. Ogilvie*, 394 U.S. 814, 818, 89 S.Ct. 1493, 1495, 23 L.Ed.2d 1 (1969), yet "not every limitation or incidental burden on the exercise of voting rights is subject to a strict standard of review." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

authenticity of the signatures on the petition. What they challenge is the required *method* for proving their authenticity. Specifically their challenge is aimed at only those portions of Conn.Gen.Stat.Ann. §§ 9–453i and 453k (1976 Supp.) underlined below which require that:

1. "Each page of a nominating petition shall be submitted *by the person who circulated the same to the town clerk of the town in which the signers reside* . . . ." § 9–453i (1976 Supp.).

2. "The town clerk shall not accept any page of a nominating petition *unless the circulator thereof signs in his presence the statement* as to the authenticity of the signatures thereon required by section 9–453j." § 9–453k(a) (1976 Supp.).

3. "The town clerk shall certify on each such page that the *circulator thereof signed such statement in his presence* and that either he knows the circulator or that the circulator satisfactorily identified himself to the town clerk." § 9–453k(b) (1976 Supp.).

Other portions of the statutes so far as relevant are set out in the margin.[7] To further refine their claim, the plaintiffs do not challenge the requirement that the circulator shall sign a statement under penalty of perjury that each signer of the petition (1) signed the petition in his or her presence, and (2) that he or she either knows the signer, or, that the signer satisfactorily identified himself or herself to the circulator.

Singled out as being unconstitutionally burdensome is the requirement that the circulator must sign the required statement before the town clerk in each town where any petition signer resides. In their brief the plaintiffs have explained that burden as follows:

"Section 9–453k would require that if, for example, a petitioner gathered signatures in 100 towns, he would have to make a personal appearance before the Town Clerk in each of those towns in order to have those signatures validated. If each of the approximately 30 circulators on behalf of Hall and Tyner were to gather signatures from all 169 towns in the State of Connecticut then each of those circulators would have to make a personal appearance before the Town Clerk of each of the individual towns. The circulators on behalf of Hall and Tyner have found that it would be impossible, in their estimation, to gather the proper number of signatures and at the same time insure that they can file each of the signatures that they have gathered before the requisite Town Clerk. Because of the time limitation, that is the requirement that petitions be submitted nine weeks prior to the election, it is a distinct possibility that signatures gathered from outlying communities will not be submitted to the Town Clerk of those communities. This practical consideration, which is forced upon the plaintiffs because of the statutory requirement, limits the right of the petitioner in the outlying towns to have his or her voice heard in determining who is to be placed on the presidential ballot."

To support their claim that the above imposes a constitutionally impermissible burden on the right of an individual to stand for election, the plaintiffs have submitted some uncontested affidavits. In substance these affidavits submitted by the

---

7. Section 9–453i (1976 Supp.):

"Each page of a nominating petition shall be submitted by the person who circulated the same to the town clerk of the town in which the signers reside at least nine weeks prior to the election."

Section 9–453j (1976 Supp.):

". . . . Each page of a nominating petition submitted to the town clerk and filed with the secretary of the state under the provisions of sections 9–453a to 9–453s, inclusive, or section 9–216 shall contain a statement as to the authenticity of the signatures thereon, signed under penalties of false statement, by the person who circulated the same, setting forth such circulator's address and the town in which such circulator is an elector and stating that each person whose name appears on such page signed the same in person in the presence of such circulator and that either the circulator knows each such signer or that the signer satisfactorily identified himself to the circulator. . . . ."

plaintiffs disclose that during the year 1976 Peter Gagyi has been circulating a petition on behalf of plaintiffs Gus Hall and Jarvis Tyner, who are attempting to have their names placed on the 1976 ballot as candidates for President and Vice President of the United States respectively. On July 24 he had petitions signed by 213 "electors or residents" of 41 Connecticut towns which he collected on weekends and off hours. He works in Danbury on Monday through Friday from 7 a. m. to 4 p. m. If he had to file these signed petitions in compliance with the statutes he would have to go to 41 towns and would thereby lose time from work. Joelle Fishman, also acting as a circulator for Gus Hall and Jarvis Tyner during the year 1976, on July 25 had on hand, yet unfiled, 773 signatures to be filed in 117 towns. Robert Ekins' affidavit attests that he is a member of the State Central Committee of the Communist Party of Connecticut and in charge of circulating petitions on behalf of Gus Hall and Jarvis Tyner. Coordinated reports from 25 of 33 circulators of petitions who have assisted him indicate that 16,727 signatures have been obtained; 4,839 of those have been validated. The remainder are classified as 6,809 "on hand" and 5,079 as "other unfiled." The number of validated signatures needed to get on the ballot is 14,093.

Subjecting the challenged signature authentication provisions to "a careful examination on our part," *McDonald v. Board of Election Commissioners,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), we note that they have a positive as well as a negative aspect. Connecticut's law does not require individual notarization of each signature, as it might, *see American Party of Texas,* 415 U.S. at 787, 94 S.Ct. 1296. Instead of having a notary present to take an acknowledgement from each and every petition signer, the challenged provisions require only that a statement by the circulator, signed in the presence of the town clerk of the town where the signer resides, that

(1) the signer signed in his presence, and (2) that either he knew the signer, or that he satisfactorily identified himself to the signer. While we are not called upon to decide whether one statement signed by the circulator in the presence of the relevant town clerk is a method for access to the ballot less restrictive than one which would require the notarization of each signature on a petition, we are inclined to think that it is more lenient.

This brings us finally to the plaintiffs' contention that the signature authenticity burden would be significantly lighter if the circulator's statement could be signed in the presence of any disinterested public official rather than in the presence of the town clerk in every town where a signer resides. They suggest that this should be required only once either in the presence of the town clerk where the *circulator* resides, or before an official in the office of the Secretary of the State.[8]

At the hearing, counsel for the State conceded that the suggested method would serve its interest in the integrity of the petition signatures as well as the present method which requires the circulator to make the statement before the town clerk. But even if the State were to be held to that concession, the petition pages would still have to be delivered to each relevant town clerk for the purpose of having the signatures checked. The plaintiffs recognize the reasonableness of a requirement that the petition must be filed with an official at the time it is authenticated and left in his custody to protect against the possibility of anyone tampering with it, and also that the signatures and addresses on it must be checked against the last completed registry list, Conn.Gen.Stat.Ann. § 9–453j, 453k and 453*l* (1976 Supp.), for the purpose of rejecting any name not on that list. The plaintiffs argue that the petitions' delivery could be effected by mailing the petitions, together with the circulator's signed state-

8. Although a personal appearance at the Secretary's office in Hartford might necessitate a longer trip to authenticate a petition signed by a resident in Norwalk, obtained by a circulator from neighboring Stamford, a circulator would need to make only one trip to file petitions signed by residents of several different towns instead of separate trips to each town.

ment of authenticity, to the town clerks to have the signatures on them checked against the registry lists, rather than requiring the delivery of them to be made by the circulator in person.

To accommodate the State's argument that the petition, once authenticated, should remain thereafter in official hands to safeguard against possible fraud, the plaintiffs state that they would be willing to provide suitably stamped and addressed envelopes in which the Secretary could mail them to the appropriate town clerks to be checked. We notice that almost all other documents required to be filed with officials may be delivered for filing by mail.

Having reduced the issue solely to whether the burden imposed by the requirement that each circulator must deliver each signed petition in person to the town clerk in the town where the signer resides is constitutionally permissible, we must decide what test to apply.

The parties do not agree upon what is the applicable rule, but we find it enunciated in *American Party of Texas,* 415 U.S. at 780, 94 S.Ct. at 1305:

"We agree with the District Court that whether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations . . . their validity depends upon whether they are necessary to further compelling state interests."

The rule provides

"no litmus-paper test . . . [and] is not self-executing . . . .. [T]he facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification"

must be considered. *Storer v. Brown,* 415 U.S. at 730, 94 S.Ct. at 1278. We think it is probable that the interest of the State in having the petition papers and the circulators' signed statement relating to the signatures on them delivered to town clerks in the 169 towns throughout the State "may be served equally well in significantly less burdensome ways." *See American Party of Texas,* 415 U.S. at 781, 94 S.Ct. at 1306.

The overall integrity of the access-to-the-ballot scheme would not be adversely affected if the Secretary of the State, or some other official connected with the election process who is centrally located were designated to receive and then mail the petitions to the relevant town clerks. The contention of the defendants that such a method would add significantly to the duties of already overworked officials is not supported by any showing of facts; and, if one were attempted, we think it would be too sparse to justify the burden presently being borne by the plaintiffs. We do not, however, find it necessary to rule on the merits of this action, since we find the plaintiffs barred by the equitable doctrine of *laches.*

## II. *Equitable Considerations*

The plaintiffs have had since the election in November of 1974 to bring this suit. The particular reason that led the plaintiffs to bring this action is not one which just cropped up. Indeed, they failed in their effort to qualify for a position on the ballot in that prior election. No explanation was offered to indicate why they did not bring this case earlier, during a time when the state legislature, the body which ultimately must choose which constitutional method should be employed, was in session.

As we have stated, on the limited record before us it would seem that "the vital state objectives . . . [could] be served equally well in significantly less burdensome ways." *American Party of Texas,* 415 U.S. at 781, 94 S.Ct. at 1306. Nevertheless, our striking down the present method at this time would not provide for a less burdensome one but would leave the State with no protection at all. We are not disposed to exercise our equitable powers in a way "which may be prejudicial to the public's interest." *United States ex rel. Greathouse v. Dern,* 289 U.S. 352, 360, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933). By affording the legislature a reasonable opportunity to devise a significantly less burdensome method, we heed the Supreme Court's admonition in *Burford v. Sun Oil Co.,* 319 U.S. 315, 334, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424

(1943), that "a sound respect for the independence of state action requires the federal court to stay its hand." We are satisfied that the refusal to exercise our equitable discretion to declare the challenged provision violative of the Constitution will not be read to mean that it is sanctioned. It has been demonstrated more than once that Connecticut's legislature acts promptly to afford suitable protection to the constitutional rights of its citizens when the need therefor is called to its attention.[9]

In light of this experience, we have no hesitation in deciding that, because the unexplained and unjustifiable delay on the part of the plaintiffs in initiating this action has created a situation which makes it impossible for this court to afford relief and at the same time safeguard the legitimate interests of the State of Connecticut, our discretion should be exercised to deny equitable relief in the nature of either an injunction or a declaratory judgment. The action is therefore dismissed.

SO ORDERED.

---

9. Most recently, following a federal decision in *Tedeschi v. Blackwood*, 410 F.Supp. 34 (D.Conn.1976) (3-judge court), which struck down the Connecticut automobile towing and lien statute, the state legislature was quick to respond with corrective legislation. *See* Conn. Gen.Stat.Ann. § 14–150, *as amended*, P.A. 76–402 (June 9, 1976).