[Civ. No. 40013. First Dist., Div. Four. June 9, 1977.]

ROBERT W. BILL et al., Plaintiffs and Appellants, v.
EUGENE D. WILLIAMS, as County Clerk, etc.,
Defendant and Respondent.

COUNSEL

David C. Lewis, Jerry Wilhelm, William C. McNeill III and Walter R. Moreno for Plaintiffs and Appellants.

James P. Botz, County Counsel, for Defendant and Respondent.

OPINION

**CHRISTIAN, J.**—Robert W. Bill and associated plaintiffs have appealed from a judgment denying declaratory and injunctive relief sought against Eugene D. Williams, County Clerk of the County of Sonoma. The action challenged the requirement that appellant Bill pay a filing fee or in lieu thereof submit a petition containing the signatures of 1,758 registered voters, to qualify for a place on the ballot as a candidate for the office of supervisor. After a temporary restraining order had been granted,

appellants' request for a preliminary injunction was submitted on the pleadings; no evidence was presented. The court denied a preliminary injunction and dissolved the temporary restraining order. Upon stipulation of the parties, the court treated that disposition as a determination of the merits of the cause of action and judgment of dismissal was rendered. The present appeal followed.

Declarations were filed in support of the application for a temporary restraining order. But neither those declarations nor any other evidence was offered at the hearing on the order to show cause for preliminary injunction. Nevertheless, the facts stated in the declarations will be related to illustrate appellants' constitutional contentions.

Appellant Robert W. Bill is a 48-year-old veteran whose income, from a veteran's disability pension and other public benefits, is $290 per month. Bill decided to run for the Sonoma County Board of Supervisors in the June 1976 election, from the Third Supervisorial District, which comprises most of the City of Santa Rosa. Bill wanted to represent the low and moderate income residents of Sonoma County whose concerns were not, in his view, receiving attention.

In order to have his name placed on the ballot for county supervisor, appellant was required to pay a filing fee of $439.40, or submit a petition signed by 1,758 registered voters from the district, or submit any combination of the two. (See Elec. Code, § 6555, subds. (a)(4), (a)(5), (b)(3); Stats. 1976, ch. 1191.) Bill obtained an "in lieu" petition from the county clerk's office and attempted to secure the requisite 1,758 signatures; he and two of his supporters began a door-to-door effort to obtain enough signatures, but did not succeed. According to the complaint and Bill's declaration, the four other candidates for supervisor in appellant's district also attempted to use the "in lieu" petition procedure, but none was able to obtain 1,758 signatures.

On March 12, 1976, before the deadline for filing for the June 8, 1976, primary election, Bill went to respondent's office, presented his nominating petitions and asked that his name be placed on the ballot as a candidate for Third District Supervisor in the June primary election. The *request was rejected*, and the present litigation was commenced.

■ Although the election which was at issue is now history, we do not consider it appropriate to dismiss the appeal as moot; the case involves a question "of general public interest [which] is likely to recur . . . ." (*Green* v. *Layton* (1975) 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225].)

■■ Appellants contend that section 6555, subdivision (a)(4) and (5),[1] of the Elections Code, which permits a candidate to submit a petition containing signatures of registered voters in lieu of a filing fee, violates the equal protection clause of the Fourteenth Amendment of the United States Constitution and article I, section 7, of the California Constitution. Appellants advance two theories: (1) under the statute, supervisorial candidates in some counties encounter a lesser signature requirement for their "in lieu" petition than supervisorial candidates in other counties; and (2) the signature requirement for counties such as Sonoma is so onerous and impractical that few, if any, candidates can gain access to the ballot through the petition procedure, leaving the ballot accessible only to those candidates who are able to pay the filing fee.

■ In any equal protection case, the appropriate standard for judging the statutory classification must be determined. The right of candidacy is not viewed as a "fundamental right" which of itself warrants strict scrutiny. However, where a practice, by impinging upon the right to run for public office, also has a real and appreciable effect on the right to vote effectively, that practice is subject to rigorous judicial review. (See *Lubin* v. *Panish* (1974) 415 U.S. 709, 716 [39 L.Ed.2d 702, 708-709, 94 S.Ct. 1315]; *Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438].)

[1]Section 6555, subdivisions (a)(4), (a)(5), of the Elections Code:
"(a) Notwithstanding any other provision of this article, a candidate may submit a petition containing signatures of registered voters in lieu of a filing fee as follows:
"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .
"(4) For all other offices for which a filing fee is required, if the number of registered voters in the district in which he seeks nomination is 2,000 or more, a candidate may submit a petition containing four signatures of registered voters for each dollar of the filing fee, or 10 percent of the total of registered voters in the district in which he seeks nomination, whichever is less.
"(5) For all other offices for which a filing fee is required, if the number of registered voters in the district in which he seeks nomination is less than 2,000, a candidate may submit a petition containing four signatures of registered voters for each dollar of the filing fee, or 20 percent of the total of registered voters in the district in which he seeks nomination, whichever is less."

In *Lubin* v. *Panish, supra,* 415 U.S. 709, the United States Supreme Court declared that the California filing fee system was unconstitutional because the statute provided no reasonable alternative which would enable an indigent person who was a serious candidate to obtain access to the ballot. The Supreme Court recognized that the state has a "compelling interest" in protecting the integrity of its political processes from frivolous or fraudulent candidacies and in regulating the size of the ballot. It held, however, that in the absence of "reasonable alternative means of ballot access," the state could not require an indigent candidate to pay a filing fee which he was not able to pay. (415 U.S. at p. 718 [39 L.Ed.2d at p. 710].) Following *Lubin,* the California Supreme Court reached the same result in *Knoll* v. *Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273], in which the court noted (fn. 11, p. 349): "The Legislature, in direct response to *Lubin,* has already enacted an alternative means of access to the ballot by providing that a candidate may submit a petition containing a specified number of signatures of registered voters in lieu of a filing fee for all elective offices. (Stats. 1974, ch. 454, amending Elec. Code, §§ 6555 and 18603 and adding Gov. Code, § 16100.6, effective July 11, 1974.) We express no opinion as to the constitutionality of the new filing fee system effective July 11, 1974." This court must therefore determine whether section 6555, subdivision (a)(4)(5), provides such a "reasonable alternative means of access." (See *Green* v. *Layton, supra,* 14 Cal.3d 922, 924.)

### Intercounty Differences

Appellants point out that, at the time of the June 8, 1976, primary election, a candidate for supervisor in Sonoma County needed an "in lieu" petition signed by approximately 8.8 percent of the registered voters in his district, whereas a candidate for supervisor in San Francisco needed only one quarter of 1 percent of the registered voters of the City and County of San Francisco. But the comparison does not show a denial of equal protection. The charter of the City and County of San Francisco specified an 11-member governing body elected at large while in Sonoma, a general law county, there are only five supervisors and each stands for election in a single-member district. (See Gov. Code, §§ 25000, 25001.)

The equal protection clause bans "invidious discrimination"; it does not, however, forbid the states to make classifications and does not require them to treat different groups uniformly. (See *Williams* v. *Rhodes* (1968) 393 U.S. 23, 39 [21 L.Ed.2d 24, 36, 89 S.Ct. 5] [Douglas, J.,

conc. opn.].) The "in lieu" petition procedure does not purport to discriminate between the residents of counties similarly situated; the fact that it does not have identical effects in all counties does not establish a denial of equal protection.

### Reasonableness of the Alternative

Appellants' second theory is that the signature requirement is so burdensome in Sonoma County that candidates cannot reasonably gain access to the ballot through that alternative; the ballot is thus claimed to be accessible only to those candidates who can pay the filing fee. In effect, appellants assert that section 6555, subdivision (a)(4)(5), fails to provide indigent supervisorial candidates with a "reasonable alternative means" of access to the ballot in lieu of paying a filing fee. (See *Lubin* v. *Panish, supra,* 415 U.S. 709, 718 [39 L.Ed.2d 702, 710]; *Knoll* v. *Davidson, supra,* 12 Cal.3d 335, 349.)

Although a state has a legitimate interest in protecting the integrity of its election process from frivolous or fraudulent candidacies (see *Storer* v. *Brown* (1974) 415 U.S. 724, 736 [39 L.Ed.2d 714, 727, 94 S.Ct. 1274]), a candidate with substantial support is entitled to a realistic alternative means of access to the ballot where his indigency renders it impossible for him to pay the prescribed filing fee. (See *Developments in the Law—Elections* (1975) 88 Harv.L.Rev. 1111, 1142, fn. 121.) "If states are required to afford access to the ballot . . . that access must be meaningful and not 'merely theoretical.' " (*McCarthy* v. *Kirkpatrick* (W.D.Mo. 1976) 420 F.Supp. 366, 375; see *American Party of Texas* v. *White* (1974) 415 U.S. 767, 783 [39 L.Ed.2d 744, 761, 94 S.Ct. 1296]; *Jenness* v. *Fortson* (1971) 403 U.S. 431, 439 [29 L.Ed.2d 554, 561, 91 S.Ct. 1970].) "The point, of course, is that ballot access must be genuinely open to all, subject to reasonable requirements." (*Lubin* v. *Panish, supra,* 415 U.S. 709, 719 [39 L.Ed.2d 702, 710]; *Knoll* v. *Davidson, supra,* 12 Cal.3d 335, 347.)

Section 6555, subdivision (a)(4), provides that if the number of registered voters in the district in which a candidate seeks nomination is 2,000 or more, he may submit in lieu of the filing fee: (1) a petition containing four signatures of registered voters for each dollar of the filing fee, *or* (2) a petition containing the signatures of 10 percent of the total of registered voters in the district in which he seeks nomination, *whichever is less.* Also, section 6555, subdivision (b)(3), provides that "A candidate may submit the appropriate number of signatures to cover all or any pro

rata portion of the filing fee." In the context of the present case, appellant was required under section 6555, subdivision (a)(4), to submit, in lieu of the filing fee, a petition containing 1,758 signatures (four times the filing fee of $439.40). At the time of the June 8, 1976, primary, this constituted a requirement of 8.8 percent of the voters registered in the district.

The question is whether a "reasonably diligent" supervisorial candidate for the third district could be expected to meet the signature requirement (see *Storer* v. *Brown, supra*, 415 U.S. 724, 738-740 [39 L.Ed.2d 714, 728-729, 94 S.Ct. 1274]; *Fishman* v. *Schaffer* (D.Conn. 1976) 418 F.Supp. 613, 615, fn. 4) or whether the statute imposes an excessively burdensome requirement upon such a candidate. (See *Storer* v. *Brown, supra*, 415 U.S. 724, 738 [39 L.Ed.2d 714, 728].) In *Storer* v. *Brown, supra*, the United States Supreme Court declared that, on its face, it did not appear to be a denial of equal protection to require an independent presidential candidate to obtain in 24 days 325,000 signatures (5 percent of the total votes cast in the last previous election). (415 U.S. at p. 740 [39 L.Ed.2d at p. 729]; see *Williams* v. *Tucker* (M.D.Penn. 1974) 382 F.Supp. 381, 385-386; see also *American Party of Texas* v. *White, supra*, 415 U.S. 767, 786-787 [39 L.Ed.2d 744, 763].) In the present case, it cannot be said that, standing alone, gathering 1,728 signatures in 55 days[2] from a pool of 25,975 qualified signers is an unreasonably burdensome or impractical undertaking for a "reasonably diligent" county supervisorial candidate for the third district. No evidence was put before the trial court; thus, the court had no basis for determining that to submit four signatures for every dollar, which the candidate could not raise for his filing fee, was not a reasonable alternative means of access to the ballot. There was no evidence of how diligent an effort was made to gather the required showing of support or of how close the candidates came to collecting the requisite number of signatures.

The judgment is affirmed.

Caldecott, P. J., concurred.

**RATTIGAN, J.**—I dissent. I agree with the majority's analysis that "[a]ppellants advance two theories: (1) under the statute, supervisorial

---

[2]The available time is determined by establishing the earliest time at which forms for "in lieu" petitions could be obtained (§§ 6490, 6555, subd. (b)) and subtracting the time before the election at which completed nominating papers must be filed (§ 6511 [repealed Stats. 1976, ch. 1191, § 60.5, No. 10, West's Cal. Legis. Service, p. 5246; No. 6, Deering's Adv. Legis. Service, p. 920])).

candidates in some counties encounter a lesser signature requirement for their 'in lieu' petition than supervisorial candidates in other counties; and (2) the signature requirement for counties such as Sonoma is so onerous and impractical that few, if any, candidates can gain access to the ballot through the petition procedure, leaving the ballot accessible only to those candidates who are able to pay the filing fee."

## I

Speaking to the second theory first, I also agree that appellants were required to make an evidentiary showing that they had exercised "reasonable diligence" in their attempt to collect 1,758 signatures in lieu of the $439.40 filing fee otherwise required for the supervisorial candidacy of appellant Bill. I do not agree with the majority's stated interpretation of the record that "[t]here was no evidence of how diligent an effort was made to gather the required showing of support or of how close the candidates came to collecting the requisite number of signatures."

The "how close" factor is irrelevant: "how close the candidates came" to success is of no significance against the undisputed fact that all of them failed. I disagree with the "no evidence" statement because I find proof of the requisite reasonable diligence in the two sworn declarations which appellants filed below and which respondent did not controvert in any respect. The declaration of appellant Bill, the unsuccessful "candidate," describes his indigence in terms to which the majority have referred and which are conclusive in the absence of contradiction. These passages followed in it, among others:

"The first hurdle I faced was the filing fee of $439.40 before I could even have my name on the ballot. Then I was told that if I couldn't pay the filing fee, I could submit signatures of 1,758 registered voters from my district who hadn't signed any other candidate's petitions, or about 9% of the registered voters. [¶] When I realized I would never be able to get enough contributions early in the campaign to pay the filing fee, I asked several supporters to assist me in gathering signatures in lieu of the filing fee. [¶] Three of us spent many hours in this effort and it became painfully obvious that we would not be able to acquire the 1,758 signatures that were necessary to avoid the filing fee so many months before the election. [¶] In my district all five (5) candidates were attempting to gather these 'in lieu' signatures from the same pool of registered voters, and to the best of my knowledge, I am the only one of

the five who could not afford to pay the filing fee. [¶] Because the signatures could be gathered only from registered voters who reside in the Third Supervisorial District, we decided that a door-to-door effort was necessary so that we were sure the voters resided in the correct district. Many people did not answer the doorbell, and those who did were very suspicious. It took a long time to explain just what we were doing and the reasons for the petition. A significant number of people were not registered to vote, and most people who could sign refused to do so because they did not want to commit themselves to a single candidate before they even knew who all the candidates were."

The other declarant was Catherine S. Bodine, one of Bill's supporters who solicited "in lieu" signatures on his behalf. Her declaration is less explicit than his in point of fact, and even more conclusionary in language, but it reads to the same general effect. Both declarations should be examined in light of considerations which are collateral but pertinent. The "in lieu" process now provided in Elections Code section 6555 having become effective in July 1974 (Stats. 1974, ch. 454, amending §§ 6555 and 18603 and adding Gov. Code, § 16100.6, eff. July 11, 1974; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 349-350 [fn. 11] [116 Cal.Rptr. 97, 525 P.2d 1273]), the election held in June 1976, was the first direct primary at which the process applied to candidates for the office of supervisor in Sonoma County. As appellant Bill indicated in his declaration, no registered voter could validly sign an "in lieu" form if the voter had already signed one for another candidate. (§ 6555, subd. (b)(2).)

These realities quite obviously complicated and protracted the explanatory burden of appellants' "in lieu" signature-collectors in the Third Supervisorial District of Sonoma County, who were competing for signatures with four other candidates and were attempting to secure the requisite 1,758 signatures within a period of 55 days (which was the duration of the interval described in the majority's fn. 2). In the absence of an objection or a motion to strike, neither of which respondent made below, the conclusionary allegations of both declarations are entitled to whatever probative value they may reasonably deliver. (See Witkin, Cal. Evidence (2d ed. 1966) § 1305, p. 1207.)

All these things considered, I deem the uncontroverted declarations sufficient as a showing that appellants exercised reasonable diligence in attempting to accomplish the objective which they, and supporters of the four competing candidates, found impossible. Having perceived that

they have met their evidentiary burden, I conclude that they have demonstrated that, as a practical matter, appellant Bill could not possibly meet the "in lieu" requirements in the Third Supervisorial District of Sonoma County.[1] This being so, the requirements fail as a "reasonable alternative means of ballot access" which the state is constitutionally obligated to make available to an indigent aspirant for public office. (*Lubin* v. *Panish* (1974) 415 U.S. 709, 718 [39 L.Ed.2d 702, 710, 94 S.Ct. 1315]; *Knoll* v. *Davidson, supra,* 12 Cal.3d 335 at p. 349.)

Had I agreed with the majority's determination that there was "no evidence" that appellants had exercised "reasonable diligence" in meeting the requirements, I would not concur in affirmance; I would at least reverse and remand with directions that the trial court hear evidence on the issue of "reasonable diligence." The United States Supreme Court did this in substance, under comparable circumstances and for cause, in at least one of the decisions principally cited by the majority. (*Storer* v. *Brown* (1974) 415 U.S. 724, 738 et seq. [39 L.Ed.2d 714, 728 et seq., 94 S.Ct. 1274].) The majority's "no evidence" determination goes no further than to hold that "reasonable diligence" must be shown and that appellants have failed to show it. Thus affirming the obvious and resting upon the quantum of evidence alone, the disposition falls far short of serving the "public interest" which prompted this court to consider the merits of the appeal notwithstanding its mootness as to appellant Bill. (See the majority opinion at its citation of *Green* v. *Layton* (1975) 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225].)

---

[1]The stated perception, and my conclusion, are based upon my assessment of the present record according to conventional appellate procedures. The conclusion will nevertheless come as no surprise to anyone acquainted with the facts of life which have made political signature-gathering an art, an industry, and a recurrent public problem, in California. As the realities apply here, they support at least the conclusions that an indigent signature-collector must rely upon a volunteer effort by others, and not upon paid help; that an indigent *candidate* for local office will find it more difficult to obtain supporting signatures because he lacks the political visibility, and the community affiliations, which may distinguish an affluent candidate; and that appellant Bill (an indigent competing with four other candidates for 1,758 valid signatures among an electorate of 25,975 registered voters who reside within the specific limits of an artificially bounded county supervisorial district) had an altogether prodigious task on his hands. There are abundant sources which establish these realities as a matter of common knowledge. (See, e.g., 27 Assem. Interim Com. Rep. (1965-1967) No. 5, Final Report of the Assembly Interim Committee on Constitutional Amendments, pp. 15, 21-32, 2 Appendix to Assem. J. (1967) [of the report proper]; Phillips, Big Wayward Girl: An Informal Political History of Cal. (1949) p. 207; Hyink, Brown & Thatcher, Politics and Government in Cal. (7th ed. 1971) p. 135. See also *Hardie* v. *Eu* (1976) 18 Cal.3d 371, 376-378 [134 Cal.Rptr. 201, 556 P.2d 301] and the authorities there cited.)

## II

Wholly apart from the question of the sufficiency of the evidence as to appellants' conduct, and as an alternative ground of my dissent, I have concluded that their first theory is valid in any event. As previously indicated, the application of Elections Code section 6555 in Sonoma County required appellants to collect 1,758 valid registered-voter signatures for filing "in lieu" of payment of the $439.40 filing fee otherwise exacted of appellant Bill's candidacy for the office of supervisor in one of that county's five supervisorial districts. Appellants showed uncontroverted statistics which demonstrate that the application of the statutory formulas (see § 6555, subds. (a)(4) and (a)(5)) produced the following comparative results across the state in 1976:

Among the counties other than Sonoma, there were 281 supervisorial districts (5 in each of the other 56 general-law and chartered counties and 1 in the chartered City and County of San Francisco, where supervisors were being elected on an at-large basis in 1976). The registered-voter count in the 281 districts ranged from a few dozen or less per district in Alpine County to a 6-digit figure per district in Los Angeles County.

The 1,758-signature requirement in Sonoma County was exceeded in only 31 of the 281 districts mentioned. The registered-voter and population count in each of these 31 districts, without exception, far exceeded the parallel figures in any of Sonoma County's five supervisorial districts. *Fewer* than 1,758 "in lieu" signatures were required in the remaining 250 districts outside of Sonoma County, many of which similarly outnumbered the 5 Sonoma County districts in registered voters and in population.[2]

---

[2]The thirty-one districts mentioned included four of the five districts in Kern County and each of the five in the Counties of Los Angeles, Orange, San Bernardino, San Diego, and San Mateo. The highest "in lieu" requirement in the state was in Los Angeles County, where the figure was only 3,524 per district. Fewer than 1,758 signatures were required in any of the five districts in each of the Counties of Santa Clara, Alameda, San Francisco (a city and county) and Sacramento. These counties comprise the first 10 "classes" of California counties. (Gov. Code, §§ 28020, 28021-28030.) Although Sonoma County was ranked as *nineteenth* in "class" in 1976 (*id.,* §§ 28020, 28040), its "in lieu" signature requirement, per supervisorial district, was roughly the *sixth* highest among all the counties of the state. In the 52 counties with lower requirements, the necessary number of "in lieu" signatures ranged downward to figures lower than 500 in many supervisorial districts and lower than 100 in some.

As to the 31 supervisorial districts in which the signature requirements exceeded Sonoma County's (see fn. 2, *ante*), the pertinent figures establish only that an indigent supervisorial candidate in any of them was required to bear a heavier burden of signature-collecting than was imposed upon appellant Bill; appellants may not be heard to complain of this fact. They may and do complain of such treatment with respect to the remaining supervisorial districts in the state, as to which the figures clearly establish that a person in his situation[3] bore a much lighter burden in all 250 of them.

The gross disparity involved may be illuminated by reference to some of the reasons for it. As to the supervisorial districts in general law counties, it must be recognized that the amount of the first year salary paid to a supervisor in any of them, 2 percent of which amount may be the prime factor in the calculation of the number of "in lieu" signatures required of an indigent candidate for the office (see § 6555, subds. (a)(4) and (a)(5); § 6554, subd. (d); § 6552, subd. (a)), is fixed by autonomous action of the local board of supervisors. (Cal. Const., art. XI, § 1, subd. (b).) The action of a board which fixes comparatively generous salaries for its members (as the Sonoma County board has apparently done) will thus operate to increase the filing fee required of a candidate for the office of supervisor (§ 6554, subd. (d); § 6552, subd. (a)) and, in automatic succession and proportionately, to increase the number of signatures which must be collected by an indigent candidate "in lieu" of paying it. (§ 6555, subds. (a)(4) and (a)(5).)

Contrasting salary action by a more frugal general law board will have precisely the opposite effects. Parallel results may be reached, in chartered counties, according to the generosity or frugality of the local electorate which may be empowered by charter to fix supervisors' salaries (Cal. Const., art. XI, § 4, subd. (b)) as one of the blessings—real or imagined—of "home rule."

In either case (i.e., in a general law or chartered county), any uniform application of the salary-based formula is utterly frustrated because the salary factor is not within the control of the Legislature and, in consequence, differs widely among the state's 58 counties. In either case, the alternative formula provided in the statute ("in lieu" signatures amounting to 20 percent of a registered voter count of "less than 2,000"

---

[3]The majority find no discrimination "between the residents of *counties similarly situated.*" (Italics added.) The empasized passage misses the entire point raised by appellants, who are claiming discrimination among *persons* who are "similarly situated," not *counties.*

or to 10 percent of a larger one) places a ceiling on the "in lieu" signature requirement. It nevertheless fails of uniform application, as well, because it frames only two categories of supervisorial district (those with "less than 2,000" registered voters, and any others) without even attempting to cope with the disparate requirements which patently exist in both.

The result is a demonstrated crazy-quilt pattern of senseless variance among the "in lieu" signature requirements which must be met by indigent supervisorial candidates throughout the various counties of the state. In this case, the practical result was to make a poor man poorer because he aspired to the office of supervisor in Sonoma County rather than in any of 51 others. (See fns. 1 and 2, *ante.*)

I can conceive of no facts which justify this situation under the "rational relation" test for a denial of equal protection, nor of any "compelling governmental interest" served by it under the "strict scrutiny test" which should apply here. (See *Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438].) I therefore find in the statutory formulas a denial of equal protection which is aggravated by involvement of the right of franchise and personal poverty as an impediment to its exercise. (*Bullock* v. *Carter* (1972) 405 U.S. 134, 143-144 [31 L.Ed.2d 92, 99-100, 92 S.Ct. 849]; *Lubin* v. *Panish, supra,* 415 U.S. 709 at pp. 717-719 [39 L.Ed.2d 702 at pp. 709-710]; *id.,* at pp. 719-723 [39 L.Ed.2d at pp. 710-713] [conc. opn. by Douglas, J.], and cases there cited; *Knoll* v. *Davidson, supra,* 12 Cal.3d 335 at pp. 346-349.) Appellant Bill is only an early victim of the formulas: there will be countless others in countless places. For these reasons, I would hold the formulas unconstitutional and reverse the judgment.

A petition for a rehearing was denied June 30, 1977. Rattigan, J., was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied August 5, 1977. Sullivan, J.,* participated therein. Bird, C. J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.