GRIFFIN, Circuit Judge,
dissenting.
I join in section II of Judge Gibbons’ opinion, except for its final paragraph. With regard to the other portions of her opinion, I respectfully dissent.
In addition, I note my disagreement with Judge Clay’s characterization of the petition warning error as “technical” or “de minimis.” Starting August 28, 2001, Ohio law required that nominating petitions warn all potential circulators and signatories, in boldface capital letters, that “WHOEVER COMMITS ELECTION FALSIFICATION IS GUILTY OF A FELONY OF THE FIFTH DEGREE.” Ohio Rev.Code § 3501.38(J). The LPO’s petitions signed after August 28, 2001, contained only the following misdemeanor warning: “THE PENALTY FOR ELECTION FALSIFICATION IS IMPRISONMENT FOR NOT MORE THAN SIX MONTHS, OR A FINE OF NOT MORE THAN ONE THOUSAND DOLLARS.” In my view, the difference in punishment between a felony and a misdemeanor is neither “technical” nor “de minimis.”
In 2004, if the state of Ohio unconstitutionally denied a political party access to its ballot, such a party remains hypothetical: it has not been identified and its plight has not been chronicled in this record. The only political party at issue in this case is plaintiff Libertarian Party of Ohio (“LPO”). But, the ballot qualifying requirements that the majority deems “severe” and declares unconstitutional were fulfilled by the LPO in 2004. In fact, the challenged regulations that require the filing of nominating petitions 120 days in advance of the primary election and participation in the primary election were complied with by the LPO, not only in 2004, *602 but also in two preceding elections. The only reason that plaintiff LPO did not qualify for Ohio’s ballot in 2004 was an error with regard to its petitions signed after August 28, 2001. If not for this serious petition error, the LPO would have been on the 2004 Ohio ballot. Because this legal error is the sole reason plaintiff LPO was denied ballot access in 2004, and because this mistake is unlikely to reoccur, I would dismiss this case as moot. U.S. CONST, art. Ill, § 2; Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990).
We lack jurisdiction over moot cases because the jurisdiction of federal courts is limited to actual and ongoing cases or controversies. As the Supreme Court stated in Lewis, 494 U.S. at 477-78, 110 S.Ct. 1249:
Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. Deakins v. Monaghan, 484 U.S. 193, 199, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988); Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision, Allen v. Wright, 468 U.S. 737, 750-751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471-473, 102 S.Ct. 752, 757-59, 70 L.Ed.2d 700 (1982). Article III denies federal courts the power “to decide questions that cannot affect the rights of litigants in the case before them,” North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), and confínes them to resolving “ ‘real and substantial controversies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.’ ” Ibid. (quoting Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)). This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. To sustain our jurisdiction in the present ease, it is not enough that a dispute was very much alive when suit was filed, or when review was obtained in the Court of Appeals. Deakins, supra, 484 U.S. at 199, 108 S.Ct. at 528; Steffel v. Thompson, 415 U.S. 452, 459, n. 10, 94 S.Ct. 1209, 1216, n. 10, 39 L.Ed.2d 505 (1974). The parties must continue to have a “ ‘personal stake in the outcome’ ” of the lawsuit, Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).
In effect, Judge Clay would relegate the constitutionally-based mootness doctrine to “the dustbin of history.” Cf. Rutan v. Republican Party of Illinois, 497 U.S. 62, 97 n. 2, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (Scalia, J., dissenting). Under his analysis, the doctrine would cease to exist because the federal courts would always have jurisdiction due to a possibility that a similarly situated party might arise, and raise at some future time, a substantially similar issue. His views on mootness are contrary to the plain wording on our limit of jurisdiction contained in Article III, Section 2.
Judge Gibbons correctly rejects Judge Clay’s notion of mootness with respect to the first issue, but inconsistently appears to follow it with regard to the second issue. Her only offered justification is that, in *603 election cases, the courts should apply a “somewhat relaxed repetition standard” in deciding whether the Constitution deprives federal courts of jurisdiction. In my view, we should not construe the provisions of our Constitution in a “strict” manner or in a “somewhat relaxed” manner. Rather, it is our role to ascertain and give effect to the plain and original meaning of the words used in our Constitution. ANTO-NIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE Law (1997). See also McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 359, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (Thomas, J., concurring), and South Carolina v. United States, 199 U.S. 437, 448, 26 S.Ct. 110, 50 L.Ed. 261 (1905).
Judge Gibbons also makes a half-heart-ed argument that perhaps were it not for the early filing deadline, the LPO might have been able to obtain a new set of 32,290 signatures after its petitions were rejected. No evidence supports this supposition. Deadlines are deadlines, whether they are “early” or “late.” Customarily, nominating petitions are filed at or near the filing deadline, and time is then afforded for the Secretary of State to accept or reject the form of the petitions and for the local boards of elections to verify the number and authenticity of the signatures. In the present case, the LPO filed its petitions on October 30, 2003, only days before the November 3, 2003, deadline. In a letter dated November 24, 2003, the LPO was notified by defendant that its petitions were rejected as invalid because they did not contain the felony warning required by Ohio law. These facts contradict the lead opinion’s conjecture and speculation regarding the possibility of the LPO’s ability to recirculate its petitions.
Regarding the arguable merits of this speculative dispute, the majority erroneously subjects the disputed Ohio election regulations to a strict scrutiny analysis which, in turn, compels the majority to rule the laws unconstitutional. Because the challenged election rules are a reasonable non-discriminatory use of Ohio’s regulatory power, I would follow the rationale of Lawrence v. Blackwell, 430 F.3d 368 (6th Cir.2005), cert. denied, — U.S. -, 126 S.Ct. 2352, 165 L.Ed.2d 278 (2006), and uphold the laws as constitutional.
Recently, in Clingman v. Beaver, 544 U.S. 581, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005), the Supreme Court emphasized that not all election regulations that burden First Amendment rights are subject to a strict scrutiny analysis. Rather, unless a state election regulation places a .heavy or severe burden on a party, “a State’s important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.” Id. at 587, 125 S.Ct. 2029 (quoting with approval Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997)).
In holding that an Oklahoma statute, which allowed political parties to open their primary elections to only their own party members and voters registered as independents, did not violate the First Amendment rights of the Libertarian Party of Oklahoma, the Supreme Court refused to apply a strict scrutiny analysis because the burden imposed by the statute was not “severe”:
[O]ur cases since Tashjian [v. Republican Party of Conn., 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) ] have clarified [that] strict scrutiny is appropriate only if the burden is severe. [California Democratic Party v.] Jones, [530 U.S. 567, 120 S.Ct. 2402 (2000)], supra, at 582, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502; Timmons, 520 *604 U.S. at 358, 117 S.Ct. 1364, 137 L.Ed.2d 589.
* * * * * *
Many electoral regulations, including voter registration generally, require that voters take some action to participate in the primary process. See, e.g., Rosario v. Rockefeller, 410 U.S. 752, 760-762, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding requirement that voters change party registration 11 months in advance of the primary election). Election laws invariably “affec[t] — at least to some degree — the individual’s right to vote and his right to associate with others for political ends.” Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).
These minor barriers between voter and party do not compel strict scrutiny. See Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result, for it is beyond question “that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.” Timmons, supra, 520 U.S. at 358, 117 S.Ct. 1364, 137 L.Ed.2d 589; Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Oklahoma’s semiclosed primary system does not severely burden the associational rights of the state’s citizenry.
C
When a state electoral provision places no heavy burden on associational rights, “a State’s important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.” Timmons, supra, 520 U.S. at 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (internal quotation marks omitted); Anderson, supra, at 788, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547.
Clingman, 544 U.S. at 592-93, 125 S.Ct. 2029. Clingman follows, and is consistent with, Timmons, which likewise refused to apply strict scrutiny to a challenge to a Minnesota law prohibiting multi-party or “fusion” candidates from appearing on the ballot. In rejecting the claim of the National New Party that the Minnesota regulation violated its First and Fourteenth Amendment rights, the Supreme Court stated:
[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder. Burdick [v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)], supra, at 433, 112 S.Ct. 2059 (“ ‘[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process’ ”) (quoting Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)); Tashjian, supra, at 217, 107 S.Ct. 544 (The Constitution grants States “broad power to prescribe the ‘Time, Places and Manner of holding Elections for Senators and Representatives,’ Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices”).
When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the “ ‘character and magnitude’ ” of the burden the State’s rule imposes on those rights against the interests the *605 State contends justify that burden, and consider the extent to which the State’s concerns make the burden necessary. Burdick, supra, at 434, 112 S.Ct. 2059 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). Regulations imposing severe burdens on plaintiffs’ rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State’s “ ‘important regulatory interests’ ” will usually be enough to justify ‘“reasonable, nondiscriminatory restrictions.’ ” Burdick, supra, at 434, 112 S.Ct. 2059 (quoting Anderson, supra, at 788, 103 S.Ct. 1564); Norman [v. Reed, 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) ], supra, at 288-289, 112 S.Ct. 698 (requiring “corresponding interest sufficiently weighty to justify the limitation”). No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. Storer, supra, at 730, 94 S.Ct. 1274 (“[N]o litmus-paper test ... separates] those restrictions that are valid from those that are invidious .... The rule is not self-executing and is no substitute for the hard judgments that must be made.”).
Timmons, 520 U.S. at 358-59, 117 S.Ct. 1364.
Although the majority purportedly undertakes the requisite balancing required by the Supreme Court’s decision in Anderson, it declines to recognize that a party challenging a State’s reasonable and nondiscriminatory regulatory interests bears “a heavy constitutional burden.” Schrader v. Blackwell, 241 F.3d 783, 790-91 (6th Cir.2001). Rather than highlight this “heavy constitutional burden,” alongside the wide discretion a state has to regulate its election system, see Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the majority cites several decisions that allegedly represent the “weight” of authority disapproving of early filing deadlines. In doing so, however, it declines to note the significant distinction between those cases and this case; i.e., that the language of Ohio’s laws in this case refer to a political party, as opposed to singling out minor parties or independent candidates. Indeed, the decisions cited by the majority for the proposition that early filing deadlines impose a severe burden predominantly deal with cases in which the deadline for independents (or minor parties) to file was substantially in advance of the primary election. See, e.g, Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 878 (3d Cir.1997) (striking down state statutory scheme requiring candidates to meet certain requirements before being recognized as a political “party”); New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1571 (11th Cir.1991) (same); McLain v. Meier, 637 F.2d 1159, 1161 n. 2 (8th Cir.1980) (same); MacBride v. Exon, 558 F.2d 443, 445 (8th Cir.1977) (holding statute constitutionally infirm “which relates to the formation of new political parties in the state” (exact language of statute not provided in the opinion’s text)); Cripps v. Seneca Cty. Bd. of Elections, 629 F.Supp. 1335, 1338 (N.D.Ohio 1985) (providing specific statute with corresponding specific deadlines for independent candidates).
Unlike those decisions, the Ohio election regulations in this case impose equal obligations on all political parties. Ohio therefore “retains the right to ensure that candidates claiming to represent a political party meet the statutory requirements necessary to establish that the putative party has obtained ‘some preliminary showing of a significant modicum of support’ before appearing on the ballot as a candidate of that party.” Schrader, 241 *606 F.3d at 791 (quoting Jenness, 403 U.S. at 442, 91 S.Ct. 1970).
Most problematically, Judge Gibbons arbitrarily characterizes “major parties” as Republican and Democrat and “minor parties” as all other political parties, despite the lack of any such distinction in Ohio’s election laws. By framing the issue in these terms, the opinion glosses over the laws’ equal treatment and applicability to all political parties.
This court recently confronted a substantially similar fact pattern in Lawrence v. Blackwell, 430 F.3d 368 (6th Cir.2005). In Lawrence, the plaintiffs, one a citizen who sought to be an independent congressional candidate and the other a voter, challenged the constitutionality of Ohio’s early filing deadline for congressional candidates (found at ohio Rev. Code § 3513.257). After the district court denied plaintiffs’ motion for preliminary injunction, this court affirmed and, in doing so, found Ohio’s early filing deadline for congressional candidates constitutional. Admittedly, La/mence addressed the impact of an early filing deadline in isolation, as opposed to the cumulative effect of an early filing deadline in conjunction with the primary election requirement. The Lawrence court’s analysis is nonetheless instructive on the issue of what level of scrutiny applies. Indeed, in a particularly relevant passage distinguishing Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), a decision upon which the majority in this case relies, our court observed:
Plaintiffs point out that in the Anderson case the Supreme Court found that an Ohio law requiring independent presidential candidates to file in March imposed a significant burden on independents and those inclined to vote for them. However, Plaintiffs gloss over a vital distinction. The early deadline discussed in Anderson imposed such a significant burden because it put independent candidates at a disadvantage vis-a-vis the major parties’ nominees who were not named until nearly five months later. In this case, congressional candidates who seek a place on the ballot through the primary process must file a declaration of candidacy sixty days before the primary election, ohio Rev. Code § 3513.05. Consequently, all candidates seeking a place on the ballot in November must engage in substantial campaign work before the early primary in order to obtain a space on the ballot. Those running in a primary must file sixty days before the primary, campaign, and win their party’s primary while independent candidates must spend the time before the primary acquiring the requisite number of signatures and then file their petition by the day before the primary. All candidates are burdened by the fact that Ohio chooses to conduct its primary at an early date, but there is no particular group which feels the additional burden of being placed at a disadvantage with respect to the rest of the field. The district court correctly concluded that this difference between this case and the Anderson case is significant. Here the burden imposed by Ohio’s early deadline is nondiscriminatory.

There is no reason for this Court to conclude that the burden Ohio has placed on all candidates to engage in significant campaign efforts prior to March in order to obtain a place on the ballot is severe or inherently unreasonable.

Lawrence, 430 F.3d at 373 (emphasis added). Accordingly, we held “the early filing deadline is both reasonable and nondiscriminatory and, therefore, within Ohio’s constitutional authority to regulate elec *607 tions as long as it advances an important state regulatory interest.” Id. at 374.
In thereafter examining whether Ohio’s congressional election scheme constitutionally advanced an important state regulatory interest, our court provided the following analysis:
Although Ohio requires independent candidates to submit their signature petitions earlier than most deadlines which have been upheld, the required number of signatures is only one percent of the relevant voting population, ohio Rev. Code. § 3513.257(C). Since a state’s interest in verifying [that] a candidate has a modicum of support justifies a burden of requiring signatures of five percent of voters by July or August, it is logical to infer that the burden Ohio has imposed by requiring signatures of only one percent by an earlier deadline is similarly justifiable. The signature requirement meets Ohio’s important state interest in verifying a candidate’s support, and the early deadline meets Ohio’s important state interest of equal treatment of candidates and its administrative interest of being able to process independent candidates’ petitions and verify signatures in the midst of completing a host of other tasks necessary to conduct a fair election. Therefore, Ohio has important state regulatory interests which are sufficient to justify the reasonable and nondiscriminatory burdens imposed by its early filing deadline.
Plaintiffs’ arguments that there are no legitimate state interests which justify such an early deadline are unpersuasive. Plaintiffs argue that placing the filing deadline so many months before the November election is not necessary. Though there is case law to support this proposition, it comes from cases in which strict scrutiny was applied and the state was, therefore, obligated to demonstrate that there was no less restrictive means by which it could achieve its important interest. See New Alliance Party, 933 F.2d at 1576. Since strict scrutiny is not appropriate in this case, Plaintiffs’ arguments and citations are inapposite.
Id. at 375 (emphasis added). As a result of the foregoing analysis, we upheld Ohio’s early filing deadline for its congressional election. Like the observations made by our court in Lawrence, the election laws in this case burden all political parties equally and the authority relied upon by the majority focuses on laws singling out so-called “independent” or “minor” parties.
The lead makes only brief reference to Lawrence, but makes no effort to distinguish or discuss it. In fact, the opinion confusingly relies on the Laurrence decision, observing that Lawrence “explicitly distinguished cases in which courts had found that deadlines far in advance of the primary election imposed a severe burden on the rights of political parties, candidates, and voters.” It is difficult to understand how Lawrence supports the majority in that it upheld an Ohio law requiring an early filing deadline.
The majority thematically relies- on the “collective burdens” imposed by the early filing deadline in conjunction with the primary election requirement. As the district court aptly noted, however, “any filing deadline, no matter how late in 'the election cycle it comes, will preclude some candidate or some political coalition from obtaining recognition on the ballot.” Moreover, the Supreme Court has held that it is considered “too plain for argument” that a state may require parties to use a primary election for selecting their nominees. American Party of Tex. v. White, 415 U.S. 767, 781, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). See also Storer v. Brown, 415 U.S. 724, 733-36, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1973).
*608 In isolation, or in tandem, the Ohio requirements of primary election and 120-day pre-election filing of petitions are reasonable. These election regulations do not impose a “severe” burden on plaintiffs’ First and Fourteenth Amendment rights.[1] In fact, the only evidence in the record on this issue is that in 2004, and in two preceding elections, plaintiff LPO was able to comply with these election requirements. Moreover, according to plaintiffs’ expert Richard Winger, in 1996 the Natural Law Party and the Reform Party qualified for the Ohio ballot, in 1998 the Libertarian Party and the Reform Party, and in 2000 the Libertarian Party and the Natural Law Party.
The lead opinion summarily concludes:
Put simply, the restrictions at issue in this case [primary election and 120-day pre-election filing] serve to prevent a minor political party from engaging in the most fundamental of political activities — recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately the right to govern.
However, the evidence is contrary to the majority’s holding. In fact, the most compelling evidence that the challenged Ohio election rules do not deprive the LPO of its First Amendment rights is that, in the past and through the present day, the LPO’s First Amendment rights have not been denied. The possibility of future deprivation is pure conjecture.
In regard to the 120-day pre-election petition filing deadline, at oral argument counsel for plaintiffs conceded its reasonableness. Plaintiffs do not dispute that, to maintain fair and orderly elections, a 120-day pre-election filing is necessary under the following general time parameters: 30 days for administrative verification of the petition form and authenticity of the required signatures; 30 days for administrative and/or judicial appeals of ballot qualification or disqualification; 30 days for the printing and distribution of proof ballots with invited corrections from the political parties and candidates, and printing and distribution of final ballots; and 30 days for the distribution of absentee ballots. Apparently, the majority would legislate a lesser, but unspecified, time frame. However, my colleagues make no argument that the 120-day time period is unreason *609 able. (“It is true that a 120-day period may be a reasonable amount of time to process the registration of a political party...")
Finally, the majority’s reliance on the “minor” party history of other states is misplaced. Each of our fifty states has its unique political dynamic. Consider the success of the Conservative and Liberal parties in New York and the Green Party and Libertarian Party in some states. The failure of third or fourth parties to thrive in Ohio is not likely the result of the challenged requirements of primary election and 120-day pre-election petition filing, but rather voter ideology, traditional party loyalty to the Republican and Democrat parties, and the unchallenged five percent automatic ballot access threshold.
In conclusion, absent a constitutional violation, it is the province of the legislature, not the courts, to write our election laws. Here, the challenged Ohio election regulations treat the LPO the same as any other political party. The primary election required by the Ohio Constitution and petition filing time requirements chosen by the Ohio General Assembly are not severe, but reasonable, in order to insure a fair, honest, and orderly election. Clingman, 544 U.S. at 581, 125 S.Ct. 2029; Timmons, 520 U.S. at 358, 117 S.Ct. 1364. Therefore, the challenged Ohio election regulations do not violate the Constitution of the United States.
For these reasons, I respectfully dissent.

. Although discussed by Judge Gibbons, it is important to note that plaintiffs do not contest Ohio's five percent automatic ballot access threshold or one percent signature requirement. In this regard, numerous courts have previously found no constitutional infirmity in a state's requirement that a political party file a petition bearing a number of signatures equal to five percent of the total votes cast in the last election. See, e.g., Jenness, 403 U.S. at 439, 442, 91 S.Ct. 1970 (upholding five percent figure because of the “open quality of the Georgia system”); Prestia v. O’Connor, 178 F.3d 86, 88 (2d Cir.1999) ("[A] requirement that ballot access petitions be signed by at least five percent of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement.”); Libertarian Party of Ill. v. Rednour, 108 F.3d 768, 775 (7th Cir.1997) (upholding five percent signature requirement); Rainbow Coalition v. Oklahoma State Election Bd., 844 F.2d 740 (10th Cir.1988) (finding constitutional Oklahoma's election scheme that authorizes candidates of recognized parties to be automatically identified on the ballot, but requires unrecognized parties to file petitions bearing five percent of total votes cast in last election before allowing party designation). Indeed, as previous courts have likewise noted, such a requirement makes sense given the state’s interest in “requiring some preliminary showing of a significant modicum of support" before printing a candidate’s name on the ballot in order to “avoid[] confusion, deception, and even frustration of the democratic process at the general election.” Jenness, 403 U.S. at 442, 91 S.Ct. 1970.