BULLOCK ET AL. *v.* CARTER ET AL.

No. 70–128.  Argued November 17, 1971—Decided February 24, 1972

BURGER, C. J., delivered the opinion of the Court, in which all Members joined except POWELL and REHNQUIST, JJ., who took no part in the consideration or decision of the case.

John F. Morehead, Special Assistant Attorney General of Texas, and Pat Bailey, Assistant Attorney General, argued the cause for appellants. With them on the brief were Crawford C. Martin, Attorney General, Nola White, First Assistant Attorney General, Alfred Walker, Executive Assistant Attorney General, J. C. Davis, William J. Craig, and W. O. Shultz II, Assistant Attorneys General, and Charles F. Herring.

A. L. Crouch argued the cause for appellees Wischkaemper et al. With him on the brief was Eugene L. Smith for appellee Carter. Joseph A. Calamia argued the cause for appellees Pate et al. With him on the briefs was John L. Fashing.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Under Texas law, a candidate must pay a filing fee as a condition to having his name placed on the ballot in a primary election.[1] The constitutionality of the Texas filing-fee system is the subject of this appeal from the judgment of a three-judge District Court.

Appellee Pate met all qualifications to be a candidate in the May 2, 1970, Democratic primary for the office of County Commissioner of Precinct Four for El Paso County, except that he was unable to pay the $1,424.60 assessment required of candidates in that pri-

[1] See Arts. 13.07a, 13.08, 13.08a, 13.15, and 13.16 of the Texas Election Code Ann. (Supp. 1970–1971).

mary. Appellee Wischkaemper sought to be placed on the Democratic primary ballot as a candidate for County Judge in Tarrant County, but he was unable to pay the $6,300 assessment for candidacy for that office. Appellee Carter wished to be a Democratic candidate for Commissioner of the General Land Office; his application was not accompanied by the required $1,000 filing fee.[2]

After being denied places on the Democratic primary ballots in their respective counties, these appellees instituted separate actions in the District Court challenging the validity of the Texas filing-fee system. Their actions were consolidated, and a three-judge District Court was convened pursuant to 28 U. S. C. §§ 2281 and 2284. Appellee Jenkins was permitted to intervene as a voter on his claimed desire to vote for Wischkaemper, and appellee Guzman and others were permitted to intervene as voters desiring to cast their ballots for Pate. On April 3, 1970, the District Court ordered that Wischkaemper and Pate be permitted to participate in the primary conducted on May 2, 1970, without prepayment of filing fees.[3] Following a hearing on the merits, the three-judge court declared the Texas filing-fee scheme unconstitutional and enjoined its enforcement.[4] 321 F. Supp. 1358 (ND Tex. 1970). A direct

---

[2] Carter also failed to have his application notarized and to have it accompanied by a statutory loyalty affidavit. Since appellees Pate and Wischkaemper were in all respects eligible to be candidates in the primary except for their failure to pay the filing fees, Carter's participation in this appeal is superfluous and we need not decide whether the additional defects in his application deprive him of standing to attack the constitutionality of the filing-fee system.

[3] The order provided that their ultimate liability for the fees would depend on the outcome of this action. Preliminary relief was not granted to Carter because of his noncompliance with requisites for candidacy unrelated to the challenged filing fees. See n. 2, supra.

[4] The specific provisions held unconstitutional are those listed in n. 1, supra.

appeal was taken under 28 U. S. C. § 1253, and we noted probable jurisdiction. 403 U. S. 904.

Under the Texas statute, payment of the filing fee is an absolute prerequisite to a candidate's participation in a primary election. There is no alternative procedure by which a potential candidate who is unable to pay the fee can get on the primary ballot by way of petitioning voters,[5] and write-in votes are not permitted in primary elections for public office.[6] Any person who is willing and able to pay the filing fee and who meets the basic eligibility requirements for holding the office sought can run in a primary.

Candidates for most district, county, and precinct offices must pay their filing fee to the county executive committee of the political party conducting the pri-

---

[5] Texas law does permit the names of independent candidates to appear on the official ballot in the general election if a proper application containing. a voter petition is submitted. The number of eligible voters required to sign the petition varies from 1% to 5% depending on the office sought. For district, county, and precinct offices, candidates must obtain the signatures of 5% of the eligible voters with a ceiling of 500 signatures. No person may sign the application of more than one person for the same office, and no person who has voted in a primary may sign the application of a candidate for an office for which a nomination was made at such primary. Art. 13.50, Tex. Election Code Ann. (1967).

No fees are assessed against candidates in general elections.

[6] Art. 13.09 (b), Tex. Election Code Ann. (Supp. 1970–1971). Write-in votes are permitted for the party offices of county chairman and precinct chairman in the general primary but not in the run-off primary. *Ibid.*

Former Art. 13.08c (repealed, Acts 1967, 60th Leg., p. 1932, c. 723, § 77) permitted write-in votes in primary elections and provided that if a write-in candidate in the first primary either received a majority of the votes or was one of the two highest vote getters in a race in which no candidate received a majority of the votes, he could not be the party's nominee in the general election or participate in the run-off primary, unless and until he paid the filing fee he would have been assessed had he originally sought a place on the primary ballot.

mary; the committee also determines the amount of the fee. The party committee must make an estimate of the total cost of the primary and apportion it among the various candidates "as in their judgment is just and equitable."[7] The committee's judgment is to be guided by "the importance, emolument, and term of office for which the nomination is to be made."[8] In counties with populations of one million or more, candidates for offices of two-year terms can be assessed up to 10% of their aggregate annual salary, and candidates for offices of four-year terms can be assessed up to 15% of their aggregate annual salary.[9] In smaller counties there are no such percentage limitations.[10]

The record shows that the fees required of the candidates in this case are far from exceptional in their magnitude.[11] The size of the filing fees is plainly a

---

[7] Art. 13.08, Tex. Election Code Ann. (Supp. 1970–1971). .

[8] *Ibid.*

[9] Art. 13.08a, Tex. Election Code Ann. (Supp. 1970–1971). This provision is applicable to Members of Congress.

[10] The $6,300 fee required of appellee Wischkaemper, for example, amounts to 32% of the $19,700 annual salary for County Judge in Tarrant County. Similarly, in the May 2, 1970, Democratic primary, candidates for five county offices in Ward County were assessed $6,250 for a filing fee; this fee represented 76.6% of the $8,160 annual salary for four of these offices; for the fifth office, that of County Commissioner, it represented 99.7% of the annual salary of $6,270.

[11] Assessments in excess of $1,000 appear to be common in many Texas counties, and assessments exceeding $5,000 are typical for certain offices in several counties. Filing fees for judgeships seem to run particularly high. Persons seeking to run in the May 2, 1970, Democratic primary for the office of District Judge in Tarrant County were required to pay $8,900 in order to have their names appear on the ballot.

It should be noted, however, that amounts not needed to finance the primary are refunded to the candidates, and that in some counties refunds tend to run as high as 50% or more of the assessed filing fee.

natural consequence of a statutory system that places the burden of financing primary elections on candidates rather than on the governmental unit, and that imposes a particularly heavy burden on candidates for local office. The filing fees required of candidates seeking nomination for state offices and offices involving statewide primaries are more closely regulated by statute and tend to be appreciably smaller. The filing fees for candidates for State Representative range from $150 to $600, depending on the population of the county from which nomination is sought.[12] Candidates for State Senator are subject to a maximum assessment of $1,000.[13]

---

[12] Arts. 13.08a, 13.16 subd. 2, Tex. Election Code Ann. (Supp. 1970–1971):

| Population of County | Filing Fee |
|---|---|
| less than 650,000 | $150 |
| 650,000 to 900,000 | $600 |
| 900,000 to 1,000,000 | $300 |
| 1,000,000 or more | $500 |

It is not clear from the face of the statute why candidates from counties having populations between 650,000 and 900,000 must pay more than candidates from counties of larger sizes.

An additional provision requires that candidates for State Representative from districts encompassing either eight or nine counties must pay $25 per county as a filing fee. Art. 13.08a, Tex. Election Code Ann. (Supp. 1970–1971).

[13] Art. 13.08a, Tex. Election Code Ann. (Supp. 1970–1971). There is a fixed-fee schedule if nomination is sought from a county with a population of 650,000 or more:

| Population of County | Filing Fee |
|---|---|
| 650,000 to 900,000* | $1,000 |
| 900,000 to 1,000,000 | $ 300 |
| 1,000,000 or more | $1,000 |

*If part of such county is joined to two or more counties to constitute a senatorial district, the filing fee is fixed at $250.

There is a ceiling on the filing fee if nomination is sought in a senatorial district encompassing counties with less than 650,000 in

Candidates for nominations requiring statewide primaries, including candidates for Governor and United States Senator, must pay a filing fee of $1,000 to the chairman of the state executive committee of the party conducting the primary.[14]  Candidates for the State Board of Education have a fixed filing fee of $50.[15]

## (1)

The filing-fee requirement is limited to party primary elections, but the mechanism of such elections is the creature of state legislative choice and hence is "state action" within the meaning of the Fourteenth Amendment.  *Gray* v. *Sanders,* 372 U. S. 368 (1963); *Nixon* v. *Herndon,* 273 U. S. 536 (1927).[16]  Although we

---

population.  Art. 13.16 subd. 1, Tex. Election Code Ann. (Supp. 1970–1971):

| Population of County | Filing Fee per County |
|---|---|
| less than 5,000 | $ 1 |
| 5,000 to 10,000 | $ 5 |
| 10,000 to 40,000 | $ 10 |
| 40,000 to 125,000 | $ 50 |
| 125,000 to 200,000 | $ 75 |
| 200,000 to 650,000 | $100 |

Persons seeking nomination in a senatorial district constituting exactly two counties must pay a filing fee of $200.

[14] Art. 13.15, Tex. Election Code Ann. (Supp. 1970–1971).  Candidates for Justice of the Court of Civil Appeals are also required to pay their filing fees to the chairman of the state committee, at the rate of 5% of one year's salary.  *Ibid.*

[15] Art. 13.08 (4), Tex. Election Code Ann. (Supp. 1970–1971).

[16] Appellants ask the Court to reconsider the scope of *Smith* v. *Allwright,* 321 U. S. 649 (1944), in which the Court held that the action of the Democratic Party of Texas in excluding Negroes from participation in party primaries constituted "state action."  See also *Terry* v. *Adams,* 345 U. S. 461 (1953); cf. *Nixon* v. *Condon,* 286 U. S. 73 (1932).  Appellants contend that not every aspect of a party primary election must be considered "state action" cognizable under the Fourteenth Amendment.  But we are here concerned with

have emphasized on numerous occasions the breadth of power enjoyed by the States in determining voter qualifications and the manner of elections, this power must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment. See, e. g., *Williams* v. *Rhodes,* 393 U. S. 23 (1968); *Evans* v. *Cornman,* 398 U. S. 419 (1970); *Carrington* v. *Rash,* 380 U. S. 89 (1965). The question presented in this case is whether a state law that prevents potential candidates for public office from seeking the nomination of their party due to their inability to pay a portion of the cost of conducting the primary election is state action that unlawfully discriminates against the candidates so excluded or the voters who wish to support them.[17]

---

the constitutionality of a state law rather than action by a political party and thus have no occasion to consider the scope of the holding in *Smith* v. *Allwright, supra.*

[17] The Texas Legislature has enacted a "contingent, temporary law" modifying the filing-fee requirement involved in this case. C. 11, H. B. 5, 62d Leg., 1st Called Sess. (1971). The new provisions allow persons unable to pay the filing fees to have their names placed on the ballot in primary elections if they submit a petition

"signed by qualified voters eligible to vote for the office for which the candidate is running, equal in number to at least 10 percent of the entire vote cast for that party's candidate for governor in the last preceding general election in the territory . . . in which the candidate is running." (Art. 13.08c (b).)

The Act provides that it is to go into effect only if "(1) the Supreme Court of the United States does not dispose of the appeal [in this case] . . . before January 1, 1972; or (2) the Supreme Court of the United States affirms or refuses to review the judgment of the district court in the aforesaid case . . ." (§ 7 (b)). The Act expires of its own force on December 31, 1972, at which time the prior law goes back into effect.

Although the Act has gone into effect due to the absence of decision by the Court on this appeal before January 1, 1972, the change in the law does not render this case moot. The effect of the "contingent,

The threshold question to be resolved is whether the filing-fee system should be sustained if it can be shown to have some rational basis,[18] or whether it must withstand a more rigid standard of review.

In *Harper* v. *Virginia Board of Elections*, 383 U. S. 663 (1966), the Court held that Virginia's imposition of an annual poll tax not exceeding $1.50 on residents over the age of 21 was a denial of equal protection. Subjecting the Virginia poll tax to close scrutiny, the Court concluded that the placing of even a minimal price on the exercise of the right to vote constituted an invidious discrimination. The problem presented by candidate filing fees is not the same, of course, and we must determine whether the strict standard of review of the *Harper* case should be applied.

The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to

temporary law" enacted by the Texas Legislature is to suspend enforcement of the strict filing-fee requirement during calendar year 1972. Since enforcement of the filing-fee requirement under the prior law was permanently enjoined by the court below, that injunction would continue to have force and effect after December 31, 1972. Furthermore, there is a continuing controversy with respect to appellees' obligation to pay the filing fees for participation in the Democratic primary held on May 2, 1970. The order of the District Court allowing appellees Pate and Wischkaemper to run in the primary without payment of fees stated that they would be liable for the fees if they did not ultimately prevail in this action. See n. 3, *supra*.

We take note of the fact that in *Johnston* v. *Luna*, 338 F. Supp. 355 (ND Tex. 1972), the same three-judge court that issued the injunction appealed from in this case, declared the new law unconstitutional and enjoined its enforcement. Our attention is confined to the case before us, and we intimate no view on the merits of that controversy.

[18] See *Dandridge* v. *Williams*, 397 U. S. 471, 485 (1970); *McGowan* v. *Maryland*, 366 U. S. 420, 425–426 (1961).

candidacy as to invoke a rigorous standard of review.[19] However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. *McDonald* v. *Board of Election,* 394 U. S. 802 (1969). Texas does not place a condition on the exercise of the right to vote,[20] nor does it quantitatively dilute votes that have been cast.[21] Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. Compare *Jenness* v. *Fortson,* 403 U. S. 431 (1971), with *Williams* v. *Rhodes,* 393 U. S. 23 (1968). In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

Unlike a filing-fee requirement that most candidates could be expected to fulfill from their own resources or at least through modest contributions, the very size of the fees imposed under the Texas system gives it a patently exclusionary character. Many potential office seekers lacking both personal wealth and affluent backers are in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support. The effect

[19] Cf. *Turner* v. *Fouche,* 396 U. S. 346, 362 (1970); *Snowden* v. *Hughes,* 321 U. S. 1 (1944).

[20] See *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Kramer* v. *Union Free School Dist. No. 15,* 395 U. S. 621 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969).

[21] See *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964); *Wesberry* v. *Sanders,* 376 U. S. 1 (1964).

of this exclusionary mechanism on voters is neither incidental nor remote. Not only are voters substantially limited in their choice of candidates, but also there is the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required by the Texas system. To the extent that the system requires candidates to rely on contributions from voters in order to pay the assessments, a phenomenon that can hardly be rare in light of the size of the fees, it tends to deny some voters the opportunity to vote for a candidate of their choosing; at the same time it gives the affluent the power to place on the ballot their own names or the names of persons they favor. Appellants do not dispute that this is endemic to the system. This disparity in voting power based on wealth cannot be described by reference to discrete and precisely defined segments of the community as is typical of inequities challenged under the Equal Protection Clause, and there are doubtless some instances of candidates representing the views of voters of modest means who are able to pay the required fee. But we would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, according to their economic status.

Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper,* that the laws must be "closely scrutinized" and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster.

(2)

Appellants contend that the filing fees required by the challenged statutes are necessary both to regulate

the ballot in primary elections and to provide a means for financing such elections.

The Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot. *Jenness* v. *Fortson,* 403 U. S., at 442; *Williams* v. *Rhodes,* 393 U. S., at 32. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.[22] Although we have no way of gauging the number of candidates who might enter primaries in Texas if access to the ballot were unimpeded by the large filing fees in question here, we are bound to respect the legitimate objectives of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies. *Jenness* v. *Fortson,* 403 U. S., at 442.

There is no escape from the conclusion that the imposition of filing fees ranging as high as $8,900 tends to limit the number of candidates entering the primaries. However, even under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation. *Morey* v. *Doud,* 354 U. S. 457, 465 (1957); *Smith* v. *Cahoon,* 283 U. S. 553, 567 (1931). To say that the filing fee requirement tends to limit the ballot to the more serious candidates is not enough. There

---

[22] The Texas Election Code provides that no person shall be nominated at a primary election for any office unless he receives a majority of the votes cast. In the event that no candidate receives a majority, a runoff election is held between the two candidates receiving the highest number of votes. Arts. 13.03, 13.07, Tex. Election Code Ann. (1967).

may well be some rational relationship between a candidate's willingness to pay a filing fee and the seriousness with which he takes his candidacy,[23] but the candidates in this case affirmatively alleged that they were *unable*, not simply *unwilling*, to pay the assessed fees, and there was no contrary evidence. It is uncontested that the filing fees exclude legitimate as well as frivolous candidates. And even assuming that every person paying the large fees required by Texas law takes his own candidacy seriously, that does not make him a "serious candidate" in the popular sense. If the Texas fee requirement is intended to regulate the ballot by weeding out spurious candidates, it is extraordinarily ill-fitted to that goal;[24] other means to protect those valid interests are available.

Instead of arguing for the reasonableness of the exclusion of some candidates, appellants rely on the fact that the filing-fee requirement is applicable only to party primaries, and point out that a candidate can gain a place on the ballot in the general election without payment of fees by submitting a proper application accompanied by a voter petition.[25] Apart from the fact that the primary election may be more crucial than the general election in certain parts of Texas,[26] we can hardly accept as reasonable an alternative that requires

---

[23] Cf. *Harper* v. *Virginia Board of Elections*, 383 U. S., at 684–685 (Harlan, J., dissenting).

[24] Cf. *Turner* v. *Fouche*, 396 U. S., at 364.

[25] Appellants state that Texas requires only the signatures of 1% of the eligible voters. Although this is true for offices voted for statewide, the candidates for local offices in this case would have had to obtain the signatures of 5% of the eligible voters up to a maximum of 500 signatures. Moreover, only those persons not voting in the primary would have been eligible to sign a nominating petition. See n. 5, *supra*.

[26] See *Carter* v. *Dies*, 321 F. Supp. 1358, 1363 (ND Tex. 1970) (Thornberry, J., concurring).

candidates and voters to abandon their party affiliations in order to avoid the burdens of the filing fees imposed by state law. Appellants have not demonstrated that their present filing-fee scheme is a necessary or reasonable tool for regulating the ballot.

In addition to the State's purported interest in regulating the ballot, the filing fees serve to relieve the State treasury of the cost of conducting the primary elections, and this is a legitimate state objective; in this limited sense it cannot be said that the fee system lacks a rational basis.[27] But under the standard of review we consider applicable to this case, there must be a showing of necessity. Appellants strenuously urge that apportioning the cost among the candidates is the only feasible means for financing the primaries. They argue that if the State must finance the primaries, it will have to determine which political bodies are "parties" so as to be entitled to state sponsorship for their nominating process, and that this will result in new claims of discrimination. Appellants seem to overlook the fact that a similar distinction is presently embodied in Texas law since only those political parties whose gubernatorial candidate received 200,000 or more votes in the last preceding general election are required to conduct primary elections.[28] Moreover, the Court has recently upheld the validity of a state law distinguishing between political parties on the basis of success in prior elections. *Jenness* v. *Fortson, supra.* We are not persuaded that Texas would be faced with an impossible task in distinguishing between political parties for the purpose of financing primaries.

We also reject the theory that since the candidates are availing themselves of the primary machinery, it

---

[27] Cf. *Harper* v. *Virginia Board of Elections*, 383 U. S., at 674 (Black, J., dissenting).

[28] Art. 13.02, Tex. Election Code Ann. (1967).

is appropriate that they pay that share of the cost that they have occasioned. The force of this argument is diluted by the fact that candidates for offices requiring statewide primaries are generally assessed at a lower rate than candidates for local office, although the statewide primaries undoubtedly involve a greater expense.[29] More importantly, the costs do not arise because candidates decide to enter a primary or because the parties decide to conduct one, but because the State has, as a matter of legislative choice, directed that party primaries be held. The State has presumably chosen this course more to benefit the voters than the candidates.

Appellants seem to place reliance on the self-evident fact that if the State must assume the cost, the voters, as taxpayers, will ultimately be burdened with the expense of the primaries. But it is far too late to make out a case that the party primary is such a lesser part of the democratic process that its cost must be shifted away from the taxpayers generally. The financial burden for general elections is carried by all taxpayers and appellants have not demonstrated a valid basis for distinguishing between these two legitimate costs of the democratic process. It seems appropriate that a primary system designed to give the voters some influence at the nominating stage should spread the cost among all of the voters in an attempt to distribute the influence without regard to wealth. Viewing the myriad governmental functions supported from general revenues, it is difficult to single out any of a higher order than the conduct of elections at all levels to bring

---

[29] This would be a different case if the fees approximated the cost of processing a candidate's application for a place on the ballot, a cost resulting from the candidate's decision to enter a primary. The term *filing* fee has long been thought to cover the cost of filing, that is, the cost of placing a particular document on the public record.

forth those persons desired by their fellow citizens to govern. Without making light of the State's interest in husbanding its revenues, we fail to see such an element of necessity in the State's present means of financing primaries as to justify the resulting incursion on the prerogatives of voters.

(3)

Since the State has failed to establish the requisite justification for this filing-fee system, we hold that it results in a denial of equal protection of the laws. It must be emphasized that nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees or licensing fees in other contexts. By requiring candidates to shoulder the costs of conducting primary elections through filing fees and by providing no reasonable alternative means of access to the ballot, the State of Texas has erected a system that utilizes the criterion of ability to pay as a condition to being on the ballot, thus excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice. These salient features of the Texas system are critical to our determination of constitutional invalidity.

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.