¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:When a county has approved a countywide 911 emergency system for"hard-wired" telephones under the Nine-One-One Emergency Number Act("911 Act"), 63 O.S. 2001 Supp.2006, §§ 2811 — 2821, may a city withinthat county adopt its own emergency 911 system ordinance, assess its ownemergency telephone system fee, and in effect, "opt out" of the countysystem, without another election and approval by the county voters?
¶ 1 Two main issues are raised by this question:
 1. In a county that has adopted a countywide 911 system, does the 911 Act permit a city to establish a separate city 911 system based on approval of city voters, without approval of voters in the entire county?
 2. If a city may establish its own 911 system, must the county 911 emergency telephone system fee continue to be paid by city telephone users in addition to the city's 911 emergency telephone system fee, until such time as that city's withdrawal from the countywide 911 system is approved in a countywide election?
¶ 2 These issues are addressed separately through the analysis of the 911 Act, its predecessor statute and consideration of constitutional requirements.
 History and Analysis of the 911 Emergency Number Act
¶ 3 The 911 Act at 63 O.S. 2001 Supp.2006, §§ 2811 — 2821, provides that a county, municipality, or some combination thereof, may create an emergency number system for hard-wired telephones and impose a charge to support the cost of the system, subject to voter approval at an election called for that purpose. See id.
¶ 4 Development of an emergency telephone service through which a citizen can advise public safety officials of an emergency by a telephone call to a centralized number was first approved by the Oklahoma Legislature in 1979, with passage of the Oklahoma Emergency Telephone Act ("1979 Act"). See 1979 Okla. Sess. Laws ch. 176, §§ 1 — 11 (current version at 63 O.S. 2001 Supp.2006, §§ 2801 — 2810). Section 2803 of Title 63 provides, in pertinent part:
 Every public agency or public safety agency within its respective jurisdiction may establish a basic or sophisticated system, if technologically compatible with the existing local telephone network. The establishment of such systems shall be centralized where feasible. Any system established pursuant to this act may include a segment of the territory of a public agency. All systems shall be designed to meet the requirements of each community and public agency served by the system. Every system, whether basic or sophisticated, may be designed to have the capability of utilizing at least three . . . [specified methods] in response to emergency calls. In addition to the number "911" a public agency or public safety agency may maintain a separate secondary backup number, and shall maintain a separate number for nonemergency telephone calls.
Id. (emphasis added) (footnote omitted). Under the basic concept of the 1979 Act, an agency or political subdivision of the State with capabilities to provide police, firefighting, medical and other emergency services may establish a method[1] of communicating emergencies called into a "911" number to appropriate departments for response by a variety of techniques. See 63 O.S. 2001 Supp.2006, §§2802, 2804. Individual public safety agencies may enter into an agreement for mutual assistance and cooperation. Id. § 2808.
¶ 5 The Legislature subsequently enacted the 911 Act, which became effective June 10, 1986. See 1986 Okla. Sess. Laws ch. 230. The purpose of the 911 Act was stated in pertinent part as follows:
 [T]o establish the telephone number nine-one-one (911) as the primary emergency telephone number for use in this state and to encourage units of local governments and combinations of such units to develop and improve emergency communication procedures and facilities in order to expedite the response of law enforcement, fire, medical, rescue, and other emergency services to any person requiring such assistance.
63 O.S. 2001, § 2812[63-2812] (emphasis added). As a means of funding the service, Section 2814(A) of the 911 Act allows a "governing body" of a local governmental entity to impose an emergency telephone service fee to finance system operation. A "governing body" is defined as:
 [T]he board of county commissioners of a county, the city council or other governing body of a municipality, or a combination of such boards, councils or other municipal governing bodies, which shall have an administering board . . . [pursuant to] an agreement between the governing body of each entity in accordance with the Interlocal Cooperation Act.
Id. § 2813(4). The scope of the 911 Act is limited to "hard-wired" or conventional land-line telephones, and does not include cellular or wireless telephone systems.[2]
¶ 6 As indicated in the emphasized part of Section 2812, quoted above, the Legislature intended to encourage a single governmental unit or a combination of such units to provide a single three-digit telephone number that a person requiring assistance might call in an emergency. This is re-emphasized in subsection (3) of Section 2812, in which the Legislature finds and declares that:
 Provision of a single, primary three-digit emergency number through which emergency services can be quickly and efficiently obtained would provide a significant contribution to law enforcement and other public safety efforts by making it less difficult to quickly notify public safety personnel.
Id. Pursuant to Sections 2814(A) and 2815(A) of the 911 Act, a governing body (as defined above) is authorized to create and operate an emergency telephone service and impose an appropriate fee, which is billed and collected by the local telephone service provider, then remitted to the governing body.
¶ 7 Preliminary to this decision, however, under the definition of "governing body," a county or a municipality must decide whether the system will be implemented by the county alone, a municipality alone or by some combination thereof. If a county and one or more municipalities are to create and operate a 911 system jointly, Section 2813(4) of the 911 Act and Section 2808 of the 1979 Act, require the cooperating entities to create a combined administering board and execute a written agreement in accordance with the Interlocal Cooperation Act (74 O.S.2001, §§ 1001[74-1001] — 1008). We conclude that under Sections 2812 and 2813(4), if no cooperative agreement is entered into before the approving election is held, a county, acting alone through its board of county commissioners (or a city acting alone through its governing body), may call and hold the election and operate the system without participation of other governmental entities within the county in the 911 system administration.
¶ 8 As conditions precedent to the creation of such a 911 system, the governing body must:
 (1) provide by resolution (in the case of county commissioners) or by ordinance (in the case of municipalities) for the operation of an emergency telephone service funded by a specified emergency telephone fee (not to exceed 15% of the local telephone tariff rate), subject to voter approval; and
 (2) call for an election within the jurisdiction of the governmental unit whereby voters must approve or disapprove the creation, operation and funding of the system.
See 63 O.S. 2001, § 2814[63-2814](B), (C). Once approved by a majority of voters, the system may go into operation and the fee be imposed upon certification of the results of the election. Id. § 2814(E). The governing body must review costs of operating the system at least once a year and make appropriate adjustments in the fee. Id. § 2814(G). While the annual fee may be reduced, it may not be increased so as to cause it to exceed the maximum approved by voters. Id. Any fee approved by the electors of a county, municipality or area served shall remain at the specified rate until a new election is conducted to approve an increased fee. Id.
¶ 9 Section 2814(E) of the 911 Act further provides:
 Any fee imposed by a county or combined governing body shall not apply to any portion of the county located within the boundaries of a municipality or other governmental entity also imposing an emergency telephone fee pursuant to the provisions of the Nine-One-One Emergency Number Act. The approved emergency telephone fee shall be effective upon certification of the election results by the county election board or boards. Except as provided for in subsections G and I of this section, an emergency telephone fee imposed prior to the effective date of this act shall continue at the established amount until an election to change the fee is called as provided for in this section.
Id. (emphasis added) (footnotes omitted). The issue presented in your question is whether the bolded language in Section 2814(E) would somehow permit a municipality ("city"), which did not have its own 911 system in operation when the county election was held, to conduct its own election, establish its own 911 system and impose its own 911 fees,after the countywide system was approved and implemented. Does the phrase "also imposing" apply only to the time of the election or does it also apply after the election? Once a county, acting alone, has called and held an election and county voters have approved the creation, operation and funding of a countywide 911 system, may a cityalso impose an emergency telephone fee under the Act, without another countywide election?
 Analysis and application of the 911 Act Section 2814(E)
¶ 10 In our view, the issues to be resolved are:
 (1) whether the creation of a separate city system is permitted by the 1979 Act and the 911 Act, particularly Section 2814(E), based on approval of only city voters and without input of the rural voters; and
 (2) if (1) is answered "yes," whether the county fee will continue to apply to city residents, until a new county election is held to approve the city's withdrawal.
¶ 11 We conclude both of these questions must be answered in the affirmative. Section 2803 of the 1979 Act and Sections 2812 through 2814 of the 911 Act, expressly provide that either a city or a county, acting alone, or some combination of a county and underlying municipalitiesmay create and operate a 911-emergency telephone system. Section 2814(E) of the 911 Act further provides "[a]ny fee imposed by a county or combined governing body shall not apply to any portion of the county located within the boundaries of a municipality or other governmental entity also imposing an emergency telephone fee pursuant to the provisions of the [911] Act." Id. (emphasis added).
¶ 12 In construing language of a statute, unless a specific definition to the contrary is provided, words are to be given their everyday meaning and applied under ordinary rules of grammar. In re City ofDurant v. Cicio, 50 P.3d 218, 221 (Okla. 2002); Gilbert Cent. Corp. v.State, 716 P.2d 654, 658 (Okla. 1986). The words "also imposing" are in the present tense and we conclude this phrase would apply at the timethe county election is held. If the Legislature had intended to allow cities to "opt out" of a countywide 911 system after county voters had approved its creation, it could certainly have said so and provided the conditions for such withdrawal, but it did not. "[L]egislative silence, when it has authority to speak, may be considered as giving rise to an implication of legislative intent." City of Duncan v. Bingham,394 P.2d 456, 460 (Okla. 1964).
¶ 13 The 911 Act and the 1979 Act do not expressly prohibit a city from establishing its own 911 system after the county of which it is a part has already done so. But importantly, neither do these actsauthorize a city to unilaterally withdraw from a countywide 911 system, without consent of the voters who approved the system in the first place. A city has and may exercise only "those powers granted in express words, those necessarily or fairly implied or incidental to the powers expressly granted, and those essential to the declared objects and purposes of the [city]." Dev. Indus., Inc. v. City of Norman,412 P.2d 953,956 (Okla. 1966). Thus, we conclude unilateral action by a city to withdraw from a countywide 911 system, without approval of county voters who initially approved the system, is not authorized and the city lacks the power to do so.
¶ 14 Further, to construe the 911 Act and Section 2803 of the 1979 Act as allowing such unilateral action would raise State constitutional issues, as outlined below. Every effort must be made to harmonize the various provisions of the legislation and give practical effect to the intention of the Legislature if possible. Bishop v. Takata Corp.,12 P.3d 459,466 n. 30 (Okla. 2000); Bd. of Educ. v. Allen, 156 P.2d 596,599 (Okla. 1945). "If there are two possible interpretations [of a statute], one of which would hold legislation unconstitutional, the construction must be applied which renders [it] constitutional."Fent v. State ex rel. Okla. Tax Comm'n, 99 P.3d 241, 247 (Okla. 2004);Gilbert Cent. Corp., 716 P.2d at 658.
¶ 15 A city may not unilaterally determine to leave the countywide system. A countywide election must be held and voter approval obtained before the county 911 system is modified to exclude the city. By analogy, a city that votes to impose a municipal sales tax (under68 O.S. 2001 Supp.2006, §§ 2701 — 2706) after the county in which it is located has imposed a county sales tax (under 68 O.S. 2001 Supp.2006, §§ 1370 — 1377) would not be immune from, and could not "opt out" of, imposition of the county tax.
¶ 16 It must be noted, however, that while 63 O.S. 2001, §2814[63-2814](K) — (O) impose on the local telephone exchange company the duty to collect the 911 service fee and remit it to the governing body, there is no express authority for such a local telephone exchange company to collect more than one service fee, nor to pay the service fee to more than one governing body. The authority for, and the mechanism by which, a local telephone exchange company might impose two fees on city telephone users and remit one to the county and one to the city is not addressed by the statute and is problematic.
 Constitutional Issues
¶ 17 Oklahoma Constitution Article X, Section19 requires that any governmental action levying a tax "shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose." Further, Article X, Section 5(B) of the Oklahoma Constitution requires that "[t]axes shall be uniform upon the same class of subjects."
¶ 18 While the levy authorized by the 911 Act is referred to as a "fee," we believe it may be treated as a tax for constitutional purposes.[3] "Any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of maintaining governmental functions, where the special benefits derived from their performance is merged in the general benefit, is a tax." 71 Am. Jur. 2dState Local Taxation § 13 (Westlaw). But whether the fee in this instance is truly a "fee" or is in fact a "tax" is immaterial to our analysis, since the Oklahoma Supreme Court and the United States Supreme Court have each applied due process and equal protection tests to fees, as well as to taxes. See Barzellone v. Presley, 126 P.3d 588, 593 (Okla. 2005); Bullock v. Carter, 405 U.S. 134, 148 (1972).
¶ 19 From your question, we assume the fee approved by county voters was for a countywide emergency telephone system. If Section 2814(E) of the 911 Act was interpreted and applied so as to allow a city (as a component part of the county) to unilaterally "opt out" of the system, then the fee could no longer be utilized for a countywide 911 system. The fee would continue to fund a system, but that system would consist of only the rural areas of the county. This is not what the county voters approved, and application of the 911 Act in this way would violate the clear requirements of Article X, Sections 5 and 19 of theOklahoma Constitution.
¶ 20 To allow a small segment of the county, i.e., a city contained within the county, to be able to override the will of a larger body of voters, plainly violates the principle of "no taxation without representation," required under our constitutional form of government, and our fundamental dedication to "consent of the governed." The Declaration of Independence, para. 2 (U.S. 1776), available at
http://memory.loc.gov/cgi-bin/ampage?collId=llsl 
fileName=001/llsl001.db recNum=124.
 Conclusion
¶ 21 Neither the 911 Act nor the 1979 Act expressly prohibits a city from creating its own emergency telephone system after the voters of the county of which it is a component part have approved a countywide system. However, neither the 911 Act nor the 1979 Act purports to allow such a city to abdicate its responsibilities and its participation in a countywide system by unilateral action. A city lacks the power to unilaterally withdraw from a countywide 911 system. If a city were to create a separate 911 system and impose a separate 911 feeafter the county has already established a system and levied a fee, our conclusion is that city telephone users would be subject toboth fees. How a local phone service provider might implement this arrangement is not addressed by the statute, and is at this point unknown.
¶ 22 Under the constitutional principles discussed above, a city that is a component part of a statutorily authorized 911 emergency telephone system approved in a countywide vote cannot unilaterally determine to withdraw from participation without approval of the voters who approved the system in the first place.
 ¶ 23 It is, therefore, the official Opinion of the Attorney General that:
 1. The Nine-One-One Emergency Number Act, 63 O.S. 2001 Supp.2006, §§ 2811 — 2821 ("911 Act"), and 63 O.S. 2001, §§ 2801[63-2801] — 2810 ("1979 Act"), do not prohibit a city from establishing an emergency telephone system and providing for imposition of fees to pay the costs of operation of the system, subject to municipal voter approval, notwithstanding prior establishment of a 911 system by the county in which the city is located.
 2. Under the 911 Act, a city included in an existing countywide 911 emergency telephone system may not, by unilateral action, withdraw from participation in the system by establishing its own city 911 system, without affirmative approval of the same body of county voters who approved the system in the first instance. 63 O.S. 2001, § 2814(E); Okla. Const. art. X, §§ 5, 19; see Bullock v. Carter, 405 U.S. 134, 148 (1972); Barzellone v. Presley, 126 P.3d 588, 593 (Okla. 2005); Dev. Indus., Inc. v. City of Norman, 412 P.2d 953, 956 (Okla. 1966).
 3. If a city located in a county that already has a 911 system undertakes to establish a separate city 911 system, telephone users in the city would be subject to both county and city 911 fees until county voters approve the city's withdrawal from the countywide system. 63 O.S. 2001, § 2814(E).
W.A. DREW EDMONDSON Attorney General of Oklahoma
LYNN C. ROGERS Assistant Attorney General
[1] The methods of communicating emergencies are defined as "direct dispatch," "referral," "relay," and "transfer." Id. § 2802(3), (8), (9), (11).
[2] Cf. A. G. Opin. 97-24, at 39-40 (discussing whether the 911 Act allowed fees for cellular telephones).
[3] See Orthopedic Hosp. v. Okla. State Dep't of Health,118 P.3d 216,221 (Okla.Civ.App. 2005); see also Olustee Co-Op Ass'n v. Okla.Wheat Utilization Research Mkt. Dev. Comm'n, 391 P.2d 216, 218 (Okla. 1964) (holding a "fee" imposed by statute was in reality a tax); 71 Am.Jur. 2d State Local Taxation § 2 (Westlaw) (defining a "tax" as "a burden, charge, exaction, imposition, or contribution, assessed in accordance with some reasonable rule of apportionment by the authority of a sovereign state upon the persons or property within its jurisdiction, to provide public revenue for the support of the government, the administration of the law, or the payment of publicexpenses." Id. (emphasis added) (footnotes omitted). Since the "fee" is described at Section 2812 in the 911 Act as being needed to "develop and improve emergency communication procedures and facilities in order to expedite the response of law enforcement, fire, medical, rescue, and other emergency services to any person requiring such assistance," it appears such a purpose is a classic use of police powers of the State to guard the health, welfare and safety of its citizens. See, e.g., ExParte Herrin, 93 P.2d 21, 28 (Okla.Crim.App. 1939).