IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**ROBERT GRAHAM,**
*Plaintiff/Appellee,*

*v.*

**FRANK TAMBURRI, AN INDIVIDUAL,**
*Defendant/Appellant,*

MICHELLE REAGAN, IN HER OFFICIAL CAPACITY AS THE SECRETARY OF THE STATE OF ARIZONA, LENORA Y. FULTON, IN HER OFFICIAL CAPACITY AS THE APACHE COUNTY RECORDER; APACHE COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; CHRISTINE RHODES, IN HER OFFICIAL CAPACITY AS COCHISE COUNTY RECORDER; COCHISE COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; PATTY HANSEN, IN HER OFFICIAL CAPACITY AS COCONINO COUNTY RECORDER, COCONINO COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; SADIE JO BINGHAM, IN HER OFFICIAL CAPACITY AS GILA COUNTY RECORDER, GILA COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; WENDY JOHN, IN HER OFFICIAL CAPACITY AS GRAHAM COUNTY RECORDER; GRAHAM COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; BERTA MANUZ, IN HER OFFICIAL CAPACITY AS GREENLEE COUNTY RECORDER, GREENLEE COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; SHELLY BAKER, IN HER OFFICIAL CAPACITY AS LA PAZ COUNTY RECORDER; LA PAZ COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; HELEN PURCELL, IN HER OFFICIAL CAPACITY AS MARICOPA COUNTY RECORDER; MARICOPA COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; ROBERT BALLARD, IN HIS OFFICIAL CAPACITY AS THE MOHAVE COUNTY RECORDER; MOHAVE COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; LAURA V. SANCHEZ, IN HER OFFICIAL CAPACITY AS NAVAJO COUNTY RECORDER; NAVAJO COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; F. ANN RODRIGUEZ, IN HER OFFICIAL CAPACITY AS THE PIMA COUNTY RECORDER; PIMA COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; VIRGINIA ROSS, IN HER OFFICIAL CAPACITY AS THE PINAL COUNTY RECORDER; PINAL COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; SUZANNE SAINZ, IN HER OFFICIAL CAPACITY AS THE SANTA CRUZ COUNTY RECORDER; SANTA CRUZ COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; LESLIE M. HOFFMAN, IN HER OFFICIAL CAPACITY AS THE YAVAPAI COUNTY RECORDER; YAVAPAI COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL CAPACITY; ROBYN STALLWORTH POUQUETTE, IN HER OFFICIAL CAPACITY AS THE YUMA COUNTY RECORDER;

**AND THE YUMA COUNTY BOARD OF SUPERVISORS, IN THEIR OFFICIAL
CAPACITY,**
*Real Parties in Interest,*
_____

No. CV-16-0143-AP/EL
Filed August 26, 2016
_____

Appeal from the Superior Court in Maricopa County
The Honorable John R. Hannah, Jr., Judge
No. CV2016-008547
**AFFIRMED**
_____

COUNSEL:

Kory Langhofer, Thomas Basile, Statecraft PLLC, Phoenix, Attorneys for
Robert Graham

Israel G. Torres, James E. Barton II, Saman J. Golestan, Torres Law Group,
PLLC, Tempe, Attorneys for Frank Tamburri

Mark Brnovich, Arizona Attorney General, James Driscoll-MacEachron,
Assistant Attorney General, Phoenix, Attorneys for Secretary of State
Michelle Reagan
_____

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE
CHIEF JUSTICE PELANDER and JUSTICES BRUTINEL, TIMMER, and
BOLICK joined.
_____

CHIEF JUSTICE BALES, opinion of the Court:

¶1 Frank Tamburri timely appealed the trial court's order
excluding his name from the Libertarian primary election ballot for the
office of United States Senator. This opinion explains the reasons for our
order entered on July 1, 2016, affirming the trial court's judgment.

**I.**

¶2 Under Arizona law, candidates of "recognized" political
parties seeking election as a United States Senator must first be nominated
by receiving the most votes in their party's primary election. *See* A.R.S.

§§ 16-213; 16-201; 16-301–302; 16-645(A). The Libertarian Party is a recognized political party. To be included on the primary election ballot, a candidate must, among other things, file a nomination petition containing signatures from qualified signers. *Id*. § 16-314(A), (B).

**¶3** Before 2015, a senatorial candidate from a recognized party needed to collect signatures from at least 0.5 percent of the party's registered voters in the state. *Id*., former § 16-322 (amended 2015). In 2014, Arizona had 3,235,963 registered voters, 26,589 of whom were members of the Libertarian Party. Ariz. Sec'y of State, State of Arizona Registration Report (2014), http://apps.azsos.gov/election/voterreg/2014-11-04.pdf. Thus, if there had there been a senatorial election in 2014, a Libertarian candidate would have needed 133 signatures from registered Libertarians to qualify for the primary election ballot.

**¶4** In 2015, however, the legislature approved H.B. 2608 and thereby amended § 16-322 to increase the base from which signatures for senatorial candidates from any party can be acquired. *See* 2015 Ariz. Sess. Laws, ch. 293, § 3 (1st Reg. Sess.). Rather than limiting the requisite signatures to only the pool of voters registered with the candidate's party, § 16-322 now requires candidates to obtain signatures totaling at least 0.25 percent of the number of qualified signers. A "qualified signer" is a voter who is (1) a registered member of the party from which the candidate is seeking nomination; (2) a registered member of a political party not entitled to continued representation pursuant to A.R.S. § 16-804; or (3) registered as an independent or no party preferred. A.R.S. § 16-321(F). Thus, a Libertarian candidate for the United States Senate in the 2016 election must obtain at least 3,034 signatures from the pool of approximately 1,213,600 qualified signers who are either registered Libertarians or unaffiliated with a recognized political party. 2016 Statewide Signature Requirements, http://www.azsos.gov/elections/running-office/running-statewide-office.

**¶5** Tamburri seeks the Libertarian Party nomination for United States Senator in the 2016 election. Pursuant to § 16-314, Tamburri timely filed a nomination petition which included 4,205 signatures. Robert Graham, Chairman of the Arizona Republican Party, filed this action challenging the validity of 2,845 signatures and seeking to exclude Tamburri's name from the Libertarian primary election ballot.

**¶6**      Tamburri concedes that he did not collect at least 3,034 signatures from "qualified signers" under §§ 16-321 and -322. Instead he argues that the 2015 amendments unconstitutionally burden his First Amendment rights to political speech and association. He also alleges that this action should be dismissed because Graham did not verify his complaint or properly serve it on all defendants. Graham in turn concedes that, if the amendments are unconstitutional, Tamburri obtained enough valid signatures under the pre-2015 version of the statutes to be included on the Libertarian primary election ballot. Thus, on the merits, the parties agree that whether the 2015 amendments to §§ 16-321 and -322 are constitutional is dispositive.

**¶7**      The trial court rejected Tamburri's procedural arguments, upheld the 2015 amendments, and issued an injunction excluding Tamburri's name from the ballot. This appeal followed.

## II.

**¶8**      Initially, we reject Tamburri's procedural arguments.   In arguing that Graham was required to verify his complaint, Tamburri cites § 16-673(B).  That statute, however, requires complaints to be verified in election contests.  This case is not an election contest but instead a challenge to a candidate's nominating petitions.  The pertinent statute does not require a verified complaint for such challenges. *See* A.R.S.  § 16-351.

**¶9**      Tamburri also is mistaken in arguing that Graham failed to properly serve the Apache County Board of Supervisors and Recorder. Graham timely served process on the Secretary of State, the officer with whom Tamburri filed his nomination paper and petitions.  Under § 16-351(D), "the board of supervisors and the recorder of each county . . . responsible for preparing the ballots that contain the challenged candidate's name and each [candidate] appoints the officer with whom the candidate files the nomination paper and petitions as the person's agent to receive service of process."  Consistent with the statute, after being served, the Secretary of State immediately telephoned all Arizona counties, including Apache County, to notify them of the challenge, and subsequently mailed the process to each county.  Service was proper as to the Apache County officials.

### III.

¶10        We turn to Tamburri's argument that the increased signature requirements under H.B. 2608 unconstitutionally burden his First Amendment rights of free speech and political association.

¶11        As the United States Supreme Court has long recognized, states "have a major role to play in structuring and monitoring the election process, including primaries." *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986)).  It is "too plain for argument" that states may require political parties to use primary elections to select their nominees.  *Id.*  States also can require candidates for political office to demonstrate a "significant modicum of support" before their names are included on the ballot.  *Id.* (citing *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)).  States, however, do not have free rein to regulate the processes by which political parties select their nominees.  *Id.* at 572–73.  Such regulation must stay within the limits imposed by the Constitution – namely an individual's First Amendment rights to political speech and association.  *Id.*

¶12        When state requirements for securing a place on the ballot are challenged on constitutional grounds, courts must weigh the burdens the law imposes on the candidate's exercise of First Amendment rights against the state interests promoted by the restriction.  *Burdick*, 504 U.S. at 434; *Libertarian Party of Washington v. Munro*, 31 F.3d 759, 761 (9th Cir. 1994).  If the statute severely burdens the candidate's ability to exercise his or her rights, the law must be narrowly tailored to advance a compelling state interest.  *Burdick*, 504 U.S. at 434; *Munro*, 31 F.3d at 761.  If, however, the statute "imposes only reasonable, nondiscriminatory restrictions" on the candidate's rights, the state's important regulatory interests are generally sufficient to justify the restrictions, as long as those interests are rationally related to the restrictions.  *Burdick*, 504 U.S. at 434; *Bullock v. Carter*, 405 U.S. 134, 142 (1972); *Munro*, 31 F.3d at 761.

### A.

¶13        H.B. 2608, like any restriction on a candidate's ballot access, imposes some burden upon Tamburri's political opportunities.  But the "mere fact that a State's system creates barriers . . . tending to limit the field

of candidates from which voters might choose . . . does not itself compel close scrutiny." *Burdick*, 504 U.S. at 433 (quoting *Bullock*, 405 U.S. at 143) (internal quotation marks omitted). Instead, the question is whether given the state's law, a "reasonably diligent" minor party candidate could normally gain access to the ballot, or if instead he or she would only rarely succeed. *Storer v. Brown*, 415 U.S. 724, 742 (1974); *Munro*, 31 F.3d at 762. The candidate has the burden of showing that Arizona's ballot access requirements severely restrict his or her political opportunities. *American Party of Texas v. White*, 415 U.S. 767, 781 (1974); *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015) (quoting *Munro*, 31 F.3d at 762).

¶14　　　Tamburri has failed to make any such showing. He first argues that H.B. 2608 severely burdens his political opportunities because it increases the number of required signatures for Libertarian senatorial candidates by approximately 2,389 percent. The issue is not, however, whether the signature requirements, as amended, are significantly greater than the pre-existing requirements, which would have required Tamburri to obtain only a few hundred signatures to qualify for the statewide ballot. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 197 (1986) (recognizing state's authority to "insist on a more substantial showing of voter support" by amending ballot access requirements). The relevant inquiry is whether the amended requirements severely restrict the political opportunities of a candidate like Tamburri, and the answer to that question turns on the minimum number of required signatures as a percentage of eligible signers. *See Storer*, 415 U.S. at 732–33; *Jenness*, 403 U.S. at 434, 438, 442; *Hall v. Simcox*, 766 F.2d 1171, 1175 (7th Cir. 1985) (noting that notwithstanding previous, significantly lower signature requirements, the constitutional "danger zone" does not begin until a state requirement goes above at least 2 percent of the total eligible signers).

¶15　　　The United States Supreme Court has consistently held that state laws requiring political candidates to obtain signatures of support from at least 5 percent of the total eligible signers do not impose a severe burden on the candidate's political opportunities. *Storer*, 415 U.S. at 732–33; *Jenness*, 403 U.S. at 438, 442. Sections 16-321 and -322 require signatures of support from only 0.25 percent of eligible signers – well within the 5 percent rule from *Jenness* and its progeny. We are not persuaded by Tamburri's argument that his political opportunities are severely burdened merely because he is now required to obtain a few thousand rather than hundreds of signatures to qualify for the primary election ballot. *See Hall*,

766 F.2d at 1175 (refusing to adopt a "constitutional ratchet" that would prevent states that have experimented with relatively low signature requirements from increasing them).

¶16 Tamburri also attempts to distinguish between eligible signers for his nomination petition under §§ 16-321 and -322 (Libertarians, independents, and voters unaffiliated with any party) and those eligible to vote in the closed Libertarian Party primary election (Libertarians only). He argues that he would have to obtain signatures from at least 12 percent of the latter to meet the 3,034 signature minimum, thereby imposing a severe burden on his political opportunities. This argument fails because the "burden" imposed by the signature requirement must be assessed relative to the number of those eligible to sign, which under §§ 16-321 and -322 is only 0.25 percent of the entire pool of eligible signers – a pool that includes more than one million registered Arizona voters.

¶17 Finally, Tamburri argues that §§ 16-321 and -322 impose severe burdens because the statutes force him to associate with non-party members to qualify for the primary ballot. We again disagree. The statutes do not require that Libertarians allow non-party members to vote in their primary. They merely require that a Libertarian candidate for United States Senate obtain sufficient signatures from voters registered with either his party or with no other recognized party. Indeed, if Tamburri had desired, he could have solicited the requisite 3,034 signatures solely from the approximately 26,000 registered Libertarians in Arizona.

¶18 Because Tamburri has not shown that Arizona's signature requirements, either facially or as applied to him, would prevent "reasonably diligent" minor party candidates from gaining ballot access, we hold that the requirements do not severely burden the ability of candidates to exercise their First Amendment rights.

**B.**

¶19 Because Arizona's signature requirements do not impose a severe burden, they need only be rationally related to an important state interest. *Burdick*, 504 U.S. at 434; *Bullock*, 405 U.S. at 142; *Munro*, 31 F.3d at 761. Our Court and the United States Supreme Court have previously recognized that states have a strong interest in ensuring that candidates in a general election have a significant modicum of support so as to avoid

clutter and confusion on the election ballot. *Bullock*, 405 U.S. at 145; *Jenness*, 403 U.S. at 442; *Lubin v. Thomas*, 213 Ariz. 496, 498 ¶ 15, 144 P.3d 510, 512 (2006).

¶20 Under Arizona's statutory framework, a candidate who wins the primary election for a recognized party is thereby placed on the general election ballot. *See* § 16-645(A). Thus, Arizona's amended signature requirements for the primary election - which do not require Libertarians to open their election to non-members - ensure that candidates who ultimately appear on the general election ballot have some "modicum of support" as allowed by the First Amendment. *Cf. Munro*, 31 F.3d at 766 (noting "[s]tates . . . may require that individual candidates, rather than parties, demonstrate substantial support as a prerequisite to getting on the ballot."). Notably, if Tamburri had not sought the nomination of a recognized party, he would have been required to obtain significantly more signatures (at least 3 percent of the number of registered voters not affiliated with any recognized party - or approximately 35,000) to qualify for the general election ballot. *See* § 16-341(E).

¶21 Based on the record before us, we conclude that the 0.25 percent signature requirement is rationally related to the state's legitimate interest in ensuring that candidates who appear on the general election ballot have some significant modicum of support. Accordingly, we reject Tamburri's contention that the signature requirements in §§ 16-321 and -322, as amended by H.B. 2608, unconstitutionally burden a candidate's exercise of First Amendment rights.

## IV.

¶22 We affirm the trial court's judgment excluding Tamburri's name from the primary ballot. Graham has requested an award of attorney fees and costs. We deny the fee request; Graham is entitled to costs under A.R.S. § 12-342 upon compliance with ARCAP 21.